NO. COA13-543

NORTH CAROLINA COURT OF APPEALS

Filed:  15 April 2014

STATE OF NORTH CAROLINA

v.

DONNELL TRACY COUSIN,
     Defendant.

|  | Caswell County |
|---|---|
|  | Nos. 11 CRS 618-19 |
|  | 11 CRS 621 |
|  | 11 CRS 623 |
|  | 11 CRS 625 |
|  | 11 CRS 627 |
|  | 11 CRS 629 |
|  | 11 CRS 631 |

Appeal by defendant from judgments entered 2 November 2012 by Judge W. Osmond Smith, III in Caswell County Superior Court. Heard in the Court of Appeals 23 October 2013.

> *Roy Cooper, Attorney General, by Ryan Haigh, Special Deputy Attorney General, for the State.*

> *McCotter Ashton, P.A., by Rudolph A. Ashton, III and Kirby H. Smith, III for defendant-appellant.*

DAVIS, Judge.

Defendant Donnell Tracy Cousin ("Defendant") appeals from his convictions of felonious obstruction of justice and accessory after the fact. His primary contentions on appeal are that the trial court erred in (1) denying him the opportunity to

question and cross-examine an investigator about suspects in the murder out of which Defendant's charges arose; (2) denying his motions to dismiss; (3) allowing the prosecution to make statements during closing argument that appealed to the passion and prejudice of the jury; and (4) imposing multiple consecutive sentences for the same acts and offenses in violation of his constitutional rights.  After careful review, we conclude that Defendant received a fair trial free from prejudicial error.

### Factual Background

The State presented evidence at trial tending to establish the following facts:  On 8 July 2005, Larry Mebane ("Mebane") was found mortally wounded in his car in Caswell County with three gunshot wounds to his head.  Lieutenant Michael Adkins ("Lt. Adkins") of the Caswell County Sheriff's Office was one of the first officers to arrive on the scene after emergency services had been contacted via a 911 call.  He found a handgun wedged between the driver's seat and the center console of the car.  Lt. Adkins also noticed that the front passenger window of Mebane's car was "busted out" and that a beer can was lying near the car.  The car was running with loud music playing on the radio.

Law enforcement officers first became aware of Defendant on 15 July 2005 when he was stopped at a checkpoint set up in the area of the shooting, which led to a subsequent interview of Defendant 11 days later at the Caswell County Sheriff's Office. When Defendant arrived at the Sheriff's Office on 26 July 2005, he gave a written statement to Investigator Jerald Brown ("Investigator Brown"), who was heading the investigation into the Mebane shooting along with State Bureau of Investigation ("SBI") Special Agent Brian Norman ("Agent Norman"). In this statement, Defendant indicated to Investigator Brown that he had seen Mebane around 10:30 p.m. on the night of the shooting. Defendant also named three specific individuals, Josh Anderson, Hugh Anderson, and Terrance Jackson, as having been with Mebane at the time of the shooting.

Defendant then voluntarily returned to the Caswell County Sheriff's Office on 30 March 2006 and provided additional information to Investigator Brown. During this meeting, Defendant stated that Mebane had been stopped earlier in the day by a man named Jeffrey Murdock and that Murdock had demanded money from Mebane. However, Defendant did not directly implicate Jeffrey Murdock in the shooting.

Defendant gave his next statement on 22 June 2006 at the Alamance County Sheriff's Office where he was being questioned in regard to unrelated felony charges in Alamance County. Defendant told investigators that "I know who the damn shooter is and I ain't going to tell him [referring to Agent Norman] nothing." Defendant proceeded to say that "Tego[1] [sic] Anderson is your shooter." Defendant added that "Josh and Hugh (Anderson) were on [sic] Josh's car and the two of them pulled over in front of Larry and got out." He then stated that "Tego [sic] pulled up behind Larry on [sic] the white truck and boxed him in so Larry couldn't go forwards or backwards. Larry got out of his car and was arguing with Josh and Hugh when Tego [sic] walked up from behind and shot Larry in the head!"

On 26 June 2006, Defendant gave another statement to Investigator Brown in which — this time — he stated that he was actually with Mebane when he was shot. Defendant stated that Mebane was being chased by Josh Anderson, Hugh Anderson, and Tino Anderson. He further related that Hugh Anderson "took a pistol and smacked Larry upside the face with it." He also said that "Hugh was the only one I saw with my own eyes with a gun."

---

[1] Tino Anderson's name is spelled in various places in the record as "Tego" Anderson. Both spellings refer to the same individual.

Defendant subsequently gave a different statement on 6 July 2006 to the Alamance County Sheriff's Office. On this occasion he stated that "[t]he night of the shooting I saw the man who shot Larry. It was Tino."

On 17 October 2006, Defendant was interviewed by Sheriff Michael Welch ("Sheriff Welch") of the Caswell County Sheriff's Office. During this interview, Defendant stated that "Tino was there, but he didn't shoot Larry."

On 14 November 2006, Defendant requested to speak with the "sheriff or someone in charge" about Mebane's murder. Chief Deputy Tim Britt ("Chief Deputy Britt") of the Alamance County Sheriff's Office was notified of Defendant's request and conducted an interview with him that was observed by Investigator Brown and Sheriff Welch. Defendant proceeded to give the following statement to Chief Deputy Britt:

> We [Defendant and Mebane] then turned right onto Dailey Store Road. . . . Sylvester Harris was in the middle of the road waving his hands. Larry Mebane stopped and got out. . . . As I was getting out of the car, I heard Sylvester Harris say to Larry Mebane, "Where is the drugs and money at, I know you got it!" . . . Sylvester's brother was standing beside the car they had been in. His name is Maurice Harris. . . . The next thing I saw as I got out of the car was Sylvester Harris shoot Larry Mebane in the back of the head.

The last statement that Defendant gave investigators occurred on 14 April 2008. Defendant claimed he had information regarding the gun used in the Mebane murder, and Investigator Brown and Sheriff Welch conducted an interview with him. Defendant denied knowing the location of the weapon but stated he could point them "in the right direction of that." He stated that Josh Anderson was Mebane's killer and admitted that his prior statements naming Tino Anderson as the shooter were deliberate falsehoods designed to mislead and misdirect law enforcement in their ongoing investigation into the murder. He admitted that "I put Tino in the middle as a block one time" and that in his earlier statements he had been "making you waste your time and gas and your ink pen." Defendant then stated that "I wasn't there on the scene period. Never was." At the end of the interview, Investigator Brown asked if everything he had told the officers was truthful, and Defendant replied "nope."

On 15 November 2011, Defendant was indicted on one count of accessory after the fact to first degree murder and seven counts of felonious obstruction of justice. A jury trial was held in Caswell County Superior Court on 29 October 2012. At the conclusion of the State's evidence, Defendant moved to dismiss

all of the charges against him. The motion was denied. Defendant renewed his motion to dismiss at the close of all the evidence, and the trial court once again denied the motion.

Defendant was convicted of all charges. He was sentenced consecutively to: (1) 168 to 211 months on the accessory after the fact charge; and (2) 168 to 211 months on the seven counts of obstruction of justice charges after the charges were consolidated. Defendant gave notice of appeal in open court.

## Analysis

### I. Denial of Defendant's Opportunity to Question Investigator Brown Regarding Other Suspects.

Defendant first argues that the trial court erred by denying him the opportunity to question Investigator Brown about other suspects in the Mebane murder. At trial, Defendant's counsel sought to elicit from Investigator Brown during cross-examination information about his interviews with persons involved in the Mebane murder investigation. Specifically, she inquired whether during his interviews with Oscar Jackson and Terrence Jackson, either of those individuals had discussed or divulged any information relating to the identity of the shooter. The State objected to this entire line of questioning on the ground that the questions sought inadmissible hearsay

because the statements sought were being offered to prove the truth of the matter asserted. The trial court sustained the State's objections. As an alternative basis, the trial court excluded the evidence under Rule 403 of the North Carolina Rules of Evidence based on the danger of unfair prejudice, confusion of the issues, and the possibility of confusing the jury.

Defendant argues the trial court's exclusion of the statements as inadmissible hearsay and under Rule 403 was erroneous. Defendant contends that this evidence was directly relevant to the issues presented and that its exclusion violated his constitutional right to present a defense.

Rule 801(c) of the North Carolina Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. R. Evid. 801(c).

Defendant asserts that in pursuing this line of questioning, he sought to "show how the investigation of Larry Mebane unfolded. More importantly, these questions were designed to determine if any of Cousin's statements to law enforcement were true and/or corroborated."

We rejected a similar argument in *State v. Hairston*, 190 N.C. App. 620, 625, 661 S.E.2d 39, 42 (2008), *disc. review*

*denied,* 363 N.C. 133, 676 S.E.2d 47 (2009). In *Hairston*, this Court found no error in the trial court's ruling that testimony by a detective about a third party's statements indicating that the third party did not know the defendant would constitute inadmissible hearsay:

> Defendant contends that the statement was not offered for the truth of the matter asserted, but instead was offered as a historical fact — that is, whether Hicks knew defendant or not. Defendant, however, goes on to argue that the trial court's ruling requires reversal because, according to defendant, such evidence would have aided defendant's arguments concerning his alibi defense. According to defendant, had the testimony been admitted, the jury could have used the information as "proof" that Brown and another person, not defendant, committed the robbery. In essence, defendant argues that the testimony was not elicited for its truth, but had it been admitted, the jury could have used the statement for the truth of the matter asserted, that Hicks, who had used the stolen credit cards, did not know defendant — thus making it less likely that defendant participated in the robbery of Moore. Accordingly, the trial court did not err in sustaining the State's objection as the testimony was offered for the truth of the matter asserted.

*Id.*

We believe the same is true here. By Defendant's own admission, he sought to offer this testimony at least in part for the purpose of demonstrating the truth of the matter

asserted. As such, the trial court did not abuse its discretion in sustaining the State's objections to this line of questioning on hearsay grounds. See *State v. Waring*, 364 N.C. 443, 498, 701 S.E.2d 615, 649 (2010) (holding that "[t]he range of cross-examination, though broad, is subject to the trial judge's discretionary powers to keep it within reasonable bounds. The trial court's rulings on cross-examination will not be held in error absent a showing that the verdict was improperly influenced thereby.") (internal quotation marks and citations omitted), *cert. denied*, ___ U.S. ___, 181 L.Ed.2d 53 (2011).[2]

Even assuming *arguendo* that the trial court erred in excluding the evidence, we believe any such error was harmless. *See State v. Augustine*, 359 N.C. 709, 731, 616 S.E.2d 515, 531 (2005) (holding that to establish prejudice resulting from an evidentiary ruling by the trial court, a defendant must show a reasonable possibility that a different result would have been reached had an evidentiary ruling not been made), *cert. denied*, 548 U.S. 925, 165 L.Ed.2d 988 (2006).

---

[2] Because we conclude the trial court's exclusion of the evidence on hearsay grounds did not constitute an abuse of discretion, we elect not to address the trial court's alternative basis for exclusion based on Rule 403.

Here, no prejudice to Defendant occurred as a result of the trial court's ruling. Our review of the record reveals that Defendant was still able to elicit similar evidence concerning the Mebane murder investigation by alternative means. *See State v. Rinck*, 303 N.C. 551, 572, 280 S.E.2d 912, 927 (1981) (holding that "any error by the trial court in sustaining the State's objections was cured when the evidence sought to be admitted was subsequently admitted without objection."). At trial, evidence concerning persons of interest in Investigator Brown's investigation was elicited through Defendant's subsequent line of questioning to Investigator Brown. Therefore, any error in the exclusion of this evidence was harmless.

Defendant also contends that the exclusion of this evidence violated his constitutional rights but concedes that no constitutional argument was asserted by him at trial. "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal, not even for plain error." *State v. Jones*, 216 N.C. App. 225, 230, 715 S.E.2d 896, 900-01 (2011) (citation and quotation marks omitted). Therefore this claim is not properly before us.

**II. Denial of Motions to Dismiss**

Defendant next contends that the trial court erred in denying his motions to dismiss the charges of felonious obstruction of justice and accessory after the fact based on the insufficiency of the evidence. A trial court's denial of a defendant's motion to dismiss is reviewed *de novo. State v. Smith,* 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). On appeal, this Court must determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator." *State v. Fritsch,* 351 N.C. 373, 378, 526 S.E.2d 451, 455 (citation and quotation marks omitted), *cert. denied,* 531 U.S. 890, 148 L.Ed.2d 150 (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith,* 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). Evidence must be viewed in the light most favorable to the State with every reasonable inference drawn in the State's favor. *State v. Rose,* 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied,* 515 U.S. 1135, 132 L.Ed.2d 818 (1995).

## A. Felonious Obstruction of Justice

> [I]n order to convict [a] Defendant of the common law offense of obstruction of justice, the State [is] required to

demonstrate that Defendant ha[s] committed an act that prevented, obstructed, impeded or hindered public or legal justice. Although obstruction of justice is ordinarily a common law misdemeanor, N.C. Gen. Stat. § 14-3(b) provides that "[i]f a misdemeanor offense as to which no specific punishment is prescribed be infamous, done in secrecy and malice, or with deceit and intent to defraud, the offender shall . . . be guilty of a Class H felony." For that reason, [u]nder N.C. Gen. Stat. § 14-3(b) (1979), for a misdemeanor at common law to be raised to a Class H felony, it must be infamous, or done in secret and with malice, or committed with deceit and intent to defraud. If the offense falls within any of these categories, it becomes a Class H felony and is punishable as such.

*State v. Taylor*, 212 N.C. App. 238, 246, 713 S.E.2d 82, 88 (2011) (internal citations and quotation marks omitted). We have previously noted that "this State has a policy against parties deliberately frustrating and causing undue expense to adverse parties gathering information about their claims. . . ." *State v. Wright*, 206 N.C. App. 239, 242, 696 S.E.2d 832, 835 (2010).

In the present case, Defendant gave eight written statements to law enforcement officers concerning the events surrounding the murder of Mebane. In his first two written statements on 26 July 2005 and 30 March 2006, he denied being at

the scene of Mebane's murder but identified individuals who may have been involved with Mebane's death.

In his next six statements on 22 June 2006, 26 June 2006, 6 July 2006, 17 October 2006, 14 November 2006, and 14 April 2008, Defendant admitted being present at the scene of the crime. In these statements, Defendant identified various alternating persons as the killer. On 22 June 2006, Defendant named Tino Anderson as the shooter and stated that Hugh Anderson and Josh Anderson were also involved. On 26 June 2006, Defendant named Hugh Anderson as the killer as he was "the only one I saw with my own eyes with a gun."

On 17 October 2006, Defendant did not identify any specific individual as the shooter but placed Tino, Hugh, and Josh Anderson at the scene and stated: "Tino was there, but he didn't shoot Larry." On 14 November 2006, Defendant gave a different story, indicating that Maurice Harris and Sylvester Harris tried to rob Mebane and that Sylvester Harris was the shooter and then stated that "the next thing I saw as I got out of the car was Sylvester Harris shoot Larry Mebane in the back of the head."

On 15 April 2008, Defendant changed his story once again, stating that "I done already gave [sic] told you the name of who

killed him already . . . Josh Anderson." Defendant also claimed in that statement that he was not at the scene when Mebane was murdered. Defendant then admitted that he had named Tino Anderson as the shooter in a previous statement as a "block." At the end of the interview, Defendant was asked if he was telling the truth and he responded "nope."

Defendant argues that the State offered no evidence that any of his statements were false or misleading and instead simply relied on the contradictory nature of Defendant's statements. We disagree.

Agent Norman of the SBI testified as to the significant burden imposed on the investigation of Mebane's murder resulting from Defendant's various conflicting statements. Agent Norman further explained that each lead was "followed up" and that the SBI ultimately determined that each person identified by Defendant had an alibi and was not present at the scene when the shooting occurred.

Clearly, when viewed in the light most favorable to the State, a jury question existed as to whether Defendant (1) unlawfully and willfully (2) obstructed justice by providing false statements to law enforcement officers investigating the death of Larry Mebane (3) with deceit and intent to defraud.

Therefore, the trial court properly denied Defendant's motion to dismiss the felonious obstruction of justice charges.

**B. Accessory After the Fact**

Defendant also asserts the trial court should have granted his motion to dismiss the charge of accessory after the fact because the State failed to produce substantial evidence that Defendant made false statements with the intent to help the actual perpetrator escape detection, arrest, or punishment.

The elements of accessory after the fact are as follows: "(1) the felony has been committed by the principal; (2) the alleged accessory gave personal assistance to that principal to aid in his escaping detection, arrest, or punishment; and (3) the alleged accessory knew the principal committed the felony." *State v. Duvall,* 50 N.C. App. 684, 691, 275 S.E.2d 842, 849, *rev'd on other grounds,* 304 N.C. 557, 284 S.E.2d 495 (1981); *see also* N.C. Gen Stat. § 14-7; *State v. Barnes,* 116 N.C. App. 311, 316, 447 S.E.2d 478, 480 (1994). We note that N.C. Gen. Stat. § 14-7 permits the conviction of an accessory after the fact "whether the principal felon shall or shall not have been previously convicted, or shall or shall not be amenable to justice. . . ." N.C. Gen. Stat. § 14-7 (2013). Furthermore,

> [t]his Court has recognized that an

> indictment may properly allege unknown conspirators in charging a criminal conspiracy. It rationally follows that an indictment is valid which alleges the existence of an unknown co-principal in charging a crime. Here the bills of indictment do not allege that [the defendant's co-conspirator] was the person who actually perpetrated the offenses. The indictments charged that a crime was committed by an unknown person and that defendant was present, aiding and abetting in the deed. Thus the acquittal of [the defendant's co-conspirator] was not a sufficient basis for dismissal of the charges.

*State v. Beach*, 283 N.C. 261, 269, 196 S.E.2d 214, 220 (1973) (internal citations omitted), *overruled on other grounds by State v. Adcock*, 310 N.C. 1, 33, 310 S.E.2d 587, 605-06 (1981). Moreover, Defendant concedes in his brief that "[t]he State does not have to identify the killer of Larry Mebane, in order to convict [Defendant] of Accessory After the Fact of First Degree Murder."

Here, as discussed above, the evidence — when viewed in the light most favorable to the State — tended to show that Defendant gave eight different written statements to authorities on his own volition providing a wide array of scenarios surrounding the death of Mebane. In these various statements, Defendant identified four different individuals as being the

person who shot Mebane. Furthermore, he admitted near the end of his 14 April 2008 interview with Investigator Brown and Sheriff Welch that he had not been truthful to investigators. The jury could rationally have concluded that his false statements were made in an effort to shield the identity of the actual shooter.

There was competent evidence introduced at trial that allowed the jury to rationally conclude that Defendant knew the identity of Mebane's shooter and was protecting that person. First, Defendant's statements to investigators suggested that he had, in fact, been present at the murder scene as his statements revealed his knowledge of information that could only have been obtained by someone physically present at the scene. In addition to knowing the location of the shooting, he also knew that (1) Mebane had been left for dead in the passenger seat of the car; (2) a handgun was found wedged in between the seat and the console of the car; (3) a beer can was left beside the car; (4) Mebane had been shot in the head; (5) the car radio was on and playing loud music following the shooting; and (6) Mebane's jaw was broken.

Second, the fact that Defendant knew the true identity of the shooter was demonstrated by the testimony of his former girlfriend, Sheila Satterfield, who testified as follows:

> Q. Sheila, the question is, did Tracy tell you he was with Larry when he got shot?
>
> A. He did. He did.
>
> Q. And did Tracy tell you how the shooting occurred?
>
> A. He said he jumped out the car and ran. All I know somebody was shooting guns. That's all I know.
>
> Q. Did Tracy eventually tell you who that shooter was?
>
> A. I can't remember the name, but we was at a store one day, and he told me it was a guy that was in a brown Honda.
>
> Q. Did he actually point out the person in the store?
>
> A. I -- see I wasn't in the store. I was in the car, and um, when he came back, he said that's the guy that killed Little Larry. Look. Look. Look. I said, Oh, I ain't looking. Get in this car, and let's go.

Finally, Defendant admitted in his 14 April 2008 statement that "I put Tino [Anderson] in the middle as a block one time," thereby raising the inference that he was deliberately thwarting the investigators' attempts to apprehend Mebane's killer. In

that same statement, Defendant further acknowledged that his false statements had made "you waste your time and gas and your ink pen," indicating that he was fully aware his false statements were resulting in a misuse of law enforcement time and resources by causing the investigators to chase false leads. The jury could rationally have concluded that the purpose of his actions was to prevent the officers from learning the identity of the actual killer.

We conclude that the evidence presented by the State was sufficient to raise a jury question as to the accessory after the fact charge. Accordingly, Defendant's argument is overruled.

## III. State's Closing Argument

Defendant next argues that the trial court abused its discretion by improperly allowing the State to make a closing argument that appealed to the jury's passion and prejudice without intervening *ex mero motu*. This argument likewise lacks merit.

"The standard of review when a defendant fails to object at trial [to statements in a closing argument] is whether the argument complained of was so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *State v.*

*Trull*, 349 N.C. 428, 451 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835, 145 L.Ed.2d 80 (1999).

> In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Id.* "Statements or remarks in closing argument must be viewed in context and in light of the overall factual circumstances to which they refer." *State v. Phillips*, 365 N.C. 103, 135, 711 S.E.2d 122, 145 (2011) (citation and internal quotation marks omitted), *cert. denied,* ___ U.S. ___, 182 L.Ed.2d 176 (2012).

Consequently, "statements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal." *State v. Murrell*, 362 N.C. 375, 394 665 S.E.2d 61, 74 (2008) (citations and internal quotation marks omitted). Our Supreme Court has further held that "[t]o merit a new trial, the prosecutor's remarks must have perverted or contaminated the trial such that they rendered the proceedings fundamentally unfair." *Phillips*, 365 N.C. at 136, 711 S.E.2d at 146.

Here, Defendant contends that the State's closing argument was improper because it "sought pity and passion for victim's family, tried to make the jury share the responsibility of the prosecutor for prosecuting this case, and sought to convict Defendant for not cooperating with law enforcement." Specifically, he appears to be challenging the prosecutor's statement that "[t]his community deserves to be safe from a murderer."

Our Supreme Court has held that "it is not improper for the State to remind the jurors that they are the voice and conscience of the community." *State v. Garcell*, 363 N.C. 10, 63, 678 S.E.2d 618, 651 (2009) (citation and internal quotation marks omitted). Therefore, we do not believe that this statement when viewed in the overall context of the closing argument in its totality required intervention *ex mero motu* by the trial court.

Defendant also appears to be contending the trial court should have intervened when the prosecutor made a comment that

> this is still somebody's child, and he didn't deserve to die like that, and his Momma didn't deserve to endure that loss, and his son from last night all the way for the rest of his life will not have his father to take him tricker-treating, to buy his Christmas or be there for Easter or

spend summer vacations, and that matters, and the State values that life, and you, the jury, values (sic) that life, and justice cries out that the person who did it be prosecuted. How many times could you have ever imagined that this case, the person who pulled the trigger and killed this young man, this father, in this room right now, in this moment there is one person in here who knows who did it, and it's the defendant. Right now. The pain and suffering that could be released. The justice that could be done, but instead of that, not once, not twice, not three times, not four times, 5, 6, 7 times over the span of seven years this man chose to lie about it in detail.

This portion of the State's argument sought to convey the notion that Defendant's pattern of false and misleading statements to investigators had prevented Mebane's family from learning the identity of his killer. "The admissibility of victim impact testimony is limited by the requirement that the evidence not be so prejudicial it renders the proceeding fundamentally unfair. Victim impact testimony is admissible to show the effect the victim's death had on friends and family members." *State v. Raines*, 362 N.C. 1, 15, 653 S.E.2d 126, 135 (2007) (internal citations and quotation marks omitted), *cert. denied*, 557 U.S. 934, 174 L.Ed.2d 601 (2009).

After reviewing the entirety of the State's closing argument and considering the context in which the challenged

statements were made, we hold once again that Defendant has failed to carry his burden of demonstrating that the trial court had a duty to intervene *ex mero motu*. Therefore, we reject Defendant's arguments on this issue.

## IV. Double Jeopardy

Defendant's final argument is that the trial court erred in sentencing Defendant for two crimes — felonious obstruction of justice and accessory after the fact — arising out of the same transaction, thereby violating his constitutional rights by subjecting him to double jeopardy. This argument likewise lacks merit.

Our Supreme Court has stated that "[b]oth the fifth amendment to the United States Constitution and article I, section 19 of the North Carolina Constitution prohibit multiple punishments for the same offense absent clear legislative intent to the contrary." *State v. Etheridge*, 319 N.C. 34, 50, 352 S.E.2d 673, 683 (1987).

> Where, as here, a single criminal transaction constitutes a violation of more than one criminal statute, the test to determine if the elements of the offenses are the same is whether each statute requires proof of a fact which the others do not. *Blockburger v. United States*, 284 U.S. 299, 76 L.Ed. 306 (1932); *State v. Perry*, 305 N.C. 225, 287 S.E. 2d 810 (1982). By

definition, all the essential elements of a lesser included offense are also elements of the greater offense. Invariably then, a lesser included offense requires no proof beyond that required for the greater offense, and the two crimes are considered identical for double jeopardy purposes. *Brown v. Ohio*, 432 U.S. 161, 53 L.Ed. 2d 187 (1977); *State v. Revelle*, 301 N.C. 153, 270 S.E. 2d 476 (1980). If neither crime constitutes a lesser included offense of the other, the convictions will fail to support a plea of double jeopardy. *See State v. Walden*, 306 N.C. 466, 293 S.E. 2d 780 (1982).

*Id.*

The Supreme Court further clarified the double jeopardy analysis in *State v. Tirado*, 358 N.C. 551, 579, 599 S.E.2d 515, 534 (2004), *cert. denied sub nom. Queen v. N.C.*, 544 U.S. 909, 161 L.Ed.2d 285 (2005):

Even where evidence to support two or more offenses overlaps, double jeopardy does not occur unless the evidence required to support the two convictions is identical. If proof of an additional fact is required for each conviction which is not required for the other, even though some of the same acts must be proved in the trial of each, the offenses are not the same.

*Id.* at 579, 599 S.E.2d at 534, (internal citation and brackets omitted).

In *Tirado*, the Supreme Court determined that the charges of attempted first-degree murder and assault with a deadly weapon

with intent to kill inflicting serious injury are not comprised of the same elements in that each requires an additional element not included in the other offense. *Id*. at 579, 599 S.E.2d at 534. Therefore, even though the crimes charged in *Tirado* arose from the exact same underlying transaction, the Court held that "[b]ecause each offense contains at least one element not included in the other, defendants have not been subjected to double jeopardy." *Id*. *See State v. Mulder,* No. COA13-672, ___ N.C. App. ___, ___, ___ S.E.2d. ___, ___ (filed Mar. 18, 2014) ("[A] defendant convicted of multiple criminal offenses in the same trial is only protected by double jeopardy principles if (1) those criminal offenses constitute the same offense . . . ; and (2) the legislature did not intend for the offenses to be punished separately. . . . [T]he applicable test to determine whether double jeopardy attaches in a single prosecution is whether each statute requires proof of a fact which the others do not." (internal citations and quotation marks omitted)).

The elements of common law felonious obstruction of justice are: (1) the defendant unlawfully and willfully; (2) obstructed justice; (3) with deceit and intent to defraud. *In re Kivett*, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983); *State v. Clemmons*, 100 N.C. App. 286, 292-93, 396 S.E.2d 616, 619 (1990).

The elements of accessory after the fact are: "(1) the felony has been committed by the principal; (2) the alleged accessory gave personal assistance to that principal to aid in his escaping detection, arrest, or punishment; and (3) the alleged accessory knew the principal committed the felony." *Duvall,* 50 N.C. App. at 691, 275 S.E.2d at 849.

Therefore, the elements of these two crimes are clearly not identical. Obstruction of justice, unlike accessory after the fact, requires deceit and intent to defraud. Accessory after the fact, unlike obstruction of justice, requires that the defendant personally assisted the principal who committed the crime in escaping detection, arrest, or punishment. The two offenses are distinct, and neither is a lesser included offense of the other. Consequently, because the charges of felonious obstruction of justice and accessory after the fact contain separate and distinct legal elements, Defendant has failed to show a double jeopardy violation.

### Conclusion

For the reasons stated above, we hold that Defendant received a fair trial free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges ELMORE and MCCULLOUGH concur.