IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA16-965

 Filed: 20 March 2018

Wake County, Nos. 14 CRS 209763 and 14 CRS 209764

STATE OF NORTH CAROLINA

 v.

MARDI JEAN DITENHAFER

 Appeal by Defendant from judgments entered 1 June 2015 by Judge Paul G.

Gessner in Superior Court, Wake County. Heard in the Court of Appeals 15 May

2017.

 Attorney General Joshua H. Stein, by Assistant Attorney General Sherri Horner
 Lawrence, for the State.

 Jarvis John Edgerton, IV, for Defendant.

 MCGEE, Chief Judge.

 Mardi Jean Ditenhafer (“Defendant”) was convicted of two counts of felony

obstruction of justice and one count of felony accessory after the fact to sexual activity

by a substitute parent. Defendant contends the trial court erred in denying her

motions to dismiss the charges and in its instruction to jurors regarding accessory

after the fact. We uphold Defendant’s conviction for obstruction of justice by causing

her daughter to recant the report of sexual abuse, but we vacate Defendant’s

conviction for obstruction of justice based on denying investigators access to the
 STATE V. DITENHAFER

 Opinion of the Court

daughter. We also vacate Defendant’s conviction for being an accessory after the fact

for her failure to report a crime.

 I. Factual and Procedural History

 The evidence at trial tended to show that in 2013, Defendant was married to

William Ditenhafer (“William”). The couple had two children, a daughter (“the

daughter”) and a younger son (“the son”). The daughter is Defendant’s biological

daughter and was adopted by William when she was in the third grade. The son is

the biological son of Defendant and William.

 The relationship between William and the daughter was initially positive.

However, in middle school, the daughter’s grades began to drop as a result of self-

esteem issues, and she began to harm herself. William punished the daughter for her

dropping grades with corporal punishment, which “scared [her] a lot with his anger

and his yelling, um, and the spankings.” The daughter tried to bring her self-esteem

and self-harming issues to the attention of Defendant, but Defendant grew angry

with the daughter and claimed the daughter was only seeking attention. As a result

of her parents’ anger at her, the daughter believed she was a painful burden on the

family.

 During eighth grade, the daughter began sending sexually suggestive pictures

of herself by text message to a boy. William discovered the photos, and he and

Defendant grounded the daughter. Rather than seek professional counseling for the

 -2-
 STATE V. DITENHAFER

 Opinion of the Court

daughter, William, with Defendant’s knowledge, began to give the daughter full-body

massages under the guise of improving her self-image. William gave the massages

to the daughter once a week while she was covered only by a towel.

 After one of the massages, the daughter took a shower to remove oil from her

body. After the shower, as the daughter was walking to her room with a towel

wrapped around her body, William called her into the living room where he was

seated on the couch. A television displayed several suggestive photographs that the

daughter had again sent to the boy by text message. William told the daughter he

had been looking at the photos and that they “turned [him] on.” He then gave the

daughter an ultimatum: either stimulate his penis with her hand or he would show

the photos to Defendant and have the daughter sent to jail. The daughter began to

cry and refused for several minutes, but ultimately relented. William then took off

his pants and instructed the daughter to drop her towel. He guided her hand along

his penis until he ejaculated. William made the daughter touch his penis at least

twice a week thereafter. William’s abuse of the daughter eventually expanded to

include making her perform fellatio on him on at least three occasions, and he gave

her a book with instructions on how to perform sex acts. The daughter did not tell

Defendant about these incidents because she feared Defendant would not believe her

and would punish her.

 -3-
 STATE V. DITENHAFER

 Opinion of the Court

 The daughter turned sixteen on 27 November 2012. Thereafter, William had

vaginal intercourse with her on multiple occasions. He also penetrated her vagina

with vibrators and his fingers several times and attempted anal penetration on

several occasions. He also bought her sexually suggestive clothing to wear for him,

took sexually suggestive videos and photographs of her in those outfits and various

stages of undress, and sent her explicit email messages requesting sexually

suggestive photographs from her. The daughter attempted to hint to Defendant that

she was being abused by leaving her undergarments in Defendant’s and William’s

bed; when confronted, William told Defendant that the daughter had just been

napping in their room. Defendant grew upset with the daughter for taking naps in

her bed, making the daughter once again fearful of telling her mother the truth.

 William’s abuse further exacerbated the daughter’s self-harming. She began

to cut parts of her body that William told her were attractive, such as her shoulders

and bellybutton. The daughter attempted suicide several times by slicing her wrists,

taking pills, and attempting to drown herself. When Defendant noticed the

daughter’s bandaged wrists after one such attempt, she told the daughter that she

thought it was just another ploy for attention.

 In the spring of 2013, when she was sixteen, the daughter visited her biological

paternal aunt (“the aunt”) in Arizona. The night before she was to fly home, the

daughter informed the aunt that she was being sexually abused and raped by her

 -4-
 STATE V. DITENHAFER

 Opinion of the Court

adoptive father. The aunt and the daughter called Defendant to tell her of the abuse

and informed Arizona law enforcement. Rather than feeling supported after the call

to her mother, the daughter felt that Defendant was “angry at [her].”

 A short time after reporting the abuse to the aunt, the daughter flew home to

North Carolina and was picked up at the airport by Defendant. Defendant told the

daughter she did not believe her, that she needed to recant, and that she needed to

stop lying because “it was going to tear apart the family and it was just going to end

horribly and that [the daughter] didn’t need to do this.” The daughter reiterated to

her mother that the abuse occurred.

 The daughter and Defendant met with Susan Dekarske (“Ms. Dekarske”) with

Wake County Child Protective Services (“CPS”) and Detective Stan Doremus

(“Detective Doremus”) with the Wake County Sheriff’s Department (“WCSD”) on 11

April 2013 in Defendant’s home. The daughter described William’s abuse of her.

CPS, William, and Defendant entered into a safety agreement whereby William was

removed from the home during the investigation into the abuse. The daughter

started seeing a therapist, Elizabeth Guarnaccia (“Ms. Guarnaccia”). The daughter

met with CPS and WCSD several times over the following months with Defendant

present or within listening distance. On almost a daily basis, Defendant pressured

the daughter to recant her allegations, including yelling at her, threatening to have

her involuntarily committed to a psychiatric hospital, calling her crazy and a

 -5-
 STATE V. DITENHAFER

 Opinion of the Court

“manipulative bitch,” and telling the son that his sister was crazy. Defendant told

the daughter that she “was tearing apart her family and destroying her family and

that William was going to go to jail . . . and [the son] was going to turn into a drug

addict and drop out of high school” as a result of the daughter’s reports of abuse.

 Defendant severed the daughter’s contact with her family in Arizona and told

her she would never see them again. Defendant later cancelled a trip the daughter

had planned to take to Arizona, as well as a family trip to a Disney theme park, telling

the daughter her allegations of abuse were “going to [cause the family to] lose our

money and . . . our stuff and the animals[.]” Defendant then told the daughter they

could go to Disney if she recanted her allegations against William. At one point,

Defendant told the daughter Defendant had breast cancer and that the daughter

needed to recant to relieve the stress it was putting on Defendant. Defendant also

began to videotape the daughter, demanding that she recant on film. Defendant also

monitored all the daughter’s phone calls and texts. Defendant told the daughter she

wished William could come back to the home. Finally, Defendant used the above facts

and assertions to turn the daughter’s grandmother and the son against the daughter.

 As a result of Defendant’s conduct, the daughter did not feel safe at home, and

considered leaving. Her thoughts of suicide returned. Ms. Dekarske testified that

“[f]or the majority part of the investigation, [the daughter] continued to inform [her]

that [Defendant] was pressuring her to recant the story[,]” and Ms. Guarnaccia

 -6-
 STATE V. DITENHAFER

 Opinion of the Court

testified that “[the daughter] said that her mother [Defendant] asked her to lie to

[Ms. Guarnaccia], to CPS, to the detectives, that her mother did not believe her and

wanted her to recant because [the abuse] didn’t happen.” Defendant denied to Ms.

Dekarske that she was coercing the daughter to recant.

 Defendant’s attempts to influence the investigation into the daughter’s abuse

were not limited to her treatment of the daughter. Defendant and the daughter met

with Ms. Dekarske and Detective Doremus on 21 June 2013. Detective Doremus

testified that Defendant was seated “[s]houlder to shoulder” with the daughter, and

with “her hand on [the daughter’s] thigh virtually the whole time[.]” He further

testified that “[i]t appeared to [him] as though [] [D]efendant was answering the

questions for [the daughter]. The questions that were being asked of [the daughter],

as soon as [the daughter] opened her mouth to talk, Defendant would answer the

questions.” At one point, Defendant told Detective Doremus that “there is some truth

to everything that [the daughter] says but not all of it is true.” Defendant also told

Ms. Dekarske that “she believe[d] [the daughter] in regards to what she had disclosed;

however, she still did not believe it was William who did that to her.” Defendant

openly expressed discomfort with the investigation at the conclusion of the interview

and told Detective Doremus that she would not permit the daughter to speak with

him alone. When Detective Doremus informed her that she could not prohibit such a

 -7-
 STATE V. DITENHAFER

 Opinion of the Court

meeting, Defendant reiterated that she was not going to authorize the daughter to

meet with Detective Doremus alone.

 On 11 July 2013, the daughter was scheduled to meet with Ms. Dekarske and

Detective Doremus at CPS’s offices and, as Defendant drove the daughter to the

meeting, the daughter told Defendant that she was going to recant because she could

no longer handle the pressure of Defendant’s constant scolding. Defendant then

began to “coach” the daughter, telling her what she should say. Defendant allowed

the daughter to meet with Ms. Dekarske and Detective Doremus outside of her

presence.

 In the meeting, the daughter told Ms. Dekarske and Detective Doremus that,

while riding to the meeting, she had told Defendant she would recant but that she

would not do so because the allegations of abuse were true. As the meeting continued,

the daughter received text messages from Defendant asking what was happening and

how long the meeting would take. As a result of the daughter’s statement, the text

messages, and his prior interactions with Defendant, Detective Doremus knew at this

point in the interview that “we had probably a limited amount of time to talk to her

before [Defendant] pulled her out of that meeting[.]” Detective Doremus asked the

daughter about emails, printouts, and other evidentiary documents indicating

William’s abuse of the daughter. Defendant soon entered the room and interrupted

the interview. Detective Doremus testified that Defendant sat down at the table with

 -8-
 STATE V. DITENHAFER

 Opinion of the Court

“a smirk on her face” and when he informed Defendant that the daughter had not

recanted, Defendant “became angry.” Ms. Dekarske and Detective Doremus showed

Defendant documentary evidence of explicit and sexually suggestive emails sent to

the daughter from their home’s internet provider. Defendant grew irate, said the

emails “[don’t] explain anything[,]” and terminated the interview.

 Defendant continued to pressure the daughter to recant her allegations of

abuse and, on 5 August 2013, following a meeting in her home with Defendant and

Ms. Dekarske, the daughter recanted her report of abuse. In the meeting, Defendant

had sought clarification from Ms. Dekarske concerning her obligation to cooperate

with local law enforcement. As Ms. Dekarske was pulling out of the driveway, the

daughter approached her car window and told Ms. Dekarske that she had made up

everything. The daughter spoke in a “very robotic [manner], saying something [as if

it had] been rehearsed for her to say.” Ms. Dekarske saw Defendant watching her

and the daughter from a window.

 Two days later, the daughter contacted Detective Doremus by phone and

recanted her report of abuse. During the call, Detective Doremus heard a third

person on the line. The daughter later e-mailed a recantation to Detective Doremus,

with Defendant “prompt[ing] [the daughter] on what to write, and [the daughter]

typ[ing] it up in [her] e-mail.” Detective Doremus followed up with the daughter in

person at her school on 29 August 2013. The daughter told Detective Doremus at the

 -9-
 STATE V. DITENHAFER

 Opinion of the Court

outset of the meeting that she was not supposed to speak to him, to which he

responded: “Don’t worry. I’m not going to ask you any questions.” He explained to

her that the investigation into her abuse was ending as a result of her recantation

and there would be no prosecution.

 In a therapy session with Ms. Guarnaccia on 10 October 2013, and attended by

Defendant, the daughter once more recanted her report of abuse, telling Ms.

Guarnaccia that she was recanting not because the abuse did not occur, but instead

because she “didn’t like what [she] was doing to [her] family.” The daughter’s

explanation upset Defendant and the daughter then denied the abuse outright. Ms.

Guarnaccia later informed Ms. Dekarske that the daughter had told her: “I am

recanting, but [the abuse] did happen.”

 By Thanksgiving 2013, William was back in the family home. His abuse of the

daughter resumed within a week, “just like [it] never stopped.” The daughter felt she

could not report the abuse to Defendant again because of Defendant’s previous

response and conduct in the prior investigation.

 In early February 2014, William demanded sex from the daughter, who was

then seventeen. She “zoned out” and complied, allegedly coerced out of fear of William

because “he was still angry and big, and [she] didn’t want to get hurt, and [she] didn’t

want what happened with [her] family to happen again.” As William and the

daughter were engaged in intercourse on Defendant’s and William’s bed, Defendant

 - 10 -
 STATE V. DITENHAFER

 Opinion of the Court

walked into the bedroom and witnessed the abuse. The daughter ran into another

room.

 Defendant began to interrogate her naked and crying daughter, asking if this

was her first time having sex or if she had previously lost her virginity. The daughter

told Defendant she had previously had sex with her boyfriend, and testified that she

was afraid to tell her mother that her prior allegations against William were true.

Defendant had witnessed William’s abuse of the daughter on the same day that she

was scheduled to meet with Detective Doremus to pick up a cell phone that had been

searched for evidence in the earlier investigation. After questioning her daughter,

Defendant had her get dressed and accompany her to a McDonald’s restaurant where

the exchange with Detective Doremus was to occur. Detective Doremus had arrived

early, and watched Defendant and the daughter park. After parking, the daughter

told Defendant that everything she had reported in the earlier investigation was true,

to which Defendant replied: “I’m not sure if I believe you or not[.]” Detective Doremus

watched Defendant and the daughter argue for a few minutes, and then exited his

vehicle to retrieve the cell phone from the trunk. Defendant met him at the rear of

his car, took the phone, and left. Defendant said nothing to Detective Doremus about

the abuse she had witnessed earlier that same day. Defendant did not tell Detective

Doremus about the conversation she had just had with her daughter, in which the

daughter asserted the truth of the prior allegations of abuse.

 - 11 -
 STATE V. DITENHAFER

 Opinion of the Court

 Defendant then left the McDonald’s restaurant to take the daughter back

home, where she planned to leave her with William and the son while Defendant was

at work. The daughter protested, and Defendant allowed her to spend the night at a

friend’s house instead. Defendant picked up her daughter the following morning and

returned her to the home with William. Defendant permitted William to stay in the

home for another month before requiring him to move.

 On 19 March 2014, more than a month after the abuse and after William

moved out of the house, Defendant called William’s brother and told him she had

witnessed William’s abuse of the daughter. William’s brother told Defendant she

needed a lawyer, and she asked him why. She then told him she would talk to an

attorney. Defendant continued to talk to William’s brother, telling him at various

times that the daughter and William “were in therapy” and that the lawyer had

advised her she “was doing everything correctly and . . . to not involve anyone else or

the authorities because that would cost . . . more money and time.” Defendant also

told him she was hopeful that William could move back home. Defendant spoke with

the daughter several times about allowing William to move back in the future, and

told her daughter not to report the abuse because “it was family business.”

 After Defendant witnessed William abusing the daughter, Defendant told the

daughter she “forg[ave] her” and that they should gather up all the pillows and sheets

on Defendant’s bed from the day she witnessed the abuse and “anything else that

 - 12 -
 STATE V. DITENHAFER

 Opinion of the Court

[William] might have used with [the daughter].” After collecting the linens,

Defendant tossed them into the backyard with the family dog because he liked to

chew things up. Eventually, Defendant and the daughter threw the items away.

 William’s brother sent an email to CPS in late April 2014 to report William’s

abuse of the daughter. The next day, CPS interviewed him, and he informed

Defendant that CPS was again involved. Defendant responded that she knew CPS

had spoken with the daughter and the son, and called CPS’s new investigation “a

nightmare.” She later called her brother-in-law, was “very angry” with him, accused

him of reporting the abuse to CPS, and reiterated that the investigation “was a

nightmare.”

 Following the report by William’s brother, a CPS assessor met the daughter at

her school and the daughter denied the abuse reported by William’s brother

“[b]ecause it’s what [she] was told to do by [Defendant].” The daughter called

Defendant to alert her that a new CPS investigation was underway. Defendant

picked her up from school and then travelled to the son’s school to prevent CPS from

meeting with him, but the assessor had already begun her interview with the son

without prior notice to Defendant. The assessor testified at trial that, in the course

of the interview, Defendant:

 burst into the conference room and grabbed [the son] and
 said, “Absolutely not. You’re not going to talk to him. You
 are not going to talk to him. This is not happening.”

 - 13 -
 STATE V. DITENHAFER

 Opinion of the Court

 She said [to the son], “Go get your book bag. I’m signing
 you out of school.”

 ...

 She was very angry. She was very angry and just said, “I
 have nothing to say to you. I have nothing to say to you.”
 And she just grabbed [the son] and walked out.

 Two days later, on 30 April 2014, Defendant agreed to speak to CPS at her

home. Despite heavy rain, wind, and thunder, Defendant refused to allow the CPS

assessor inside, and insisted that the interview take place outside the home. Rather

than confirm the abuse she had witnessed firsthand, Defendant informed the

assessor that she was separated from William and that he was no longer allowed in

the house “to avoid any more lies from [the daughter].” She told the assessor that

CPS and its agents were not permitted to speak to her children at school unless a

parent or attorney was present, and that the only place she would authorize contact

would be outside her home. The assessor then discussed alternative temporary living

arrangements for the children. At no point in the interview did Defendant state that

she witnessed William’s abuse of the daughter. In fact, Defendant never disclosed

that information to CPS in the course of its investigation.

 Warrants for Defendant’s arrest were issued on 1 May 2014 for felony

obstruction of justice and felony accessory after the fact to William’s abuse of the

daughter. A grand jury issued two indictments on those charges on 20 May 2014,

charging Defendant with one count of accessory after the fact and one count of felony

 - 14 -
 STATE V. DITENHAFER

 Opinion of the Court

obstruction of justice. The grand jury returned a superseding indictment on 9

September 2014 for one count of accessory after the fact to sexual activity by a

substitute parent. The superseding indictment for accessory after the fact alleged

that Defendant “unlawfully, willfully and feloniously did knowingly assist William

. . . in escaping detection, arrest or punishment by not reporting the incident after he

committed the felony of Sexual Activity by a Substitute Parent.”

 Defendant moved for a bill of particulars concerning the indictment for

obstruction of justice, which was denied by the trial court after the State agreed to

resubmit the charge to the grand jury to resolve any deficiencies in the initial

indictment. The State returned a superseding indictment for felony obstruction of

justice on 10 March 2015, which alleged two separate counts:

 I. . . . [D]efendant . . . unlawfully, willfully, and feloniously
 obstructed justice with deceit and intent to defraud and
 obstruct an investigation into the sexual abuse of a minor
 to wit: [] [D]efendant facilitated and encouraged [the]
 daughter . . . to recant allegations of sexual abuse against
 [William]. . . .

 II. . . . [D]efendant . . . unlawfully, willfully, and feloniously
 obstructed justice with deceit and intent to defraud and
 obstruct an investigation into the sexual abuse of a minor
 to wit: [] [D]efendant denied [WCSD] and [CPS] access to
 [the] daughter . . . throughout the course of the
 investigation . . . .

 Defendant was tried on two charges of felony obstruction of justice and one

charge of accessory after the fact on 26 May 2015. After the close of evidence,

 - 15 -
 STATE V. DITENHAFER

 Opinion of the Court

Defendant moved to dismiss each charge for insufficient evidence and for “a variance

between the crime alleged in the indictment and any crime for which the State’s

evidence may have been sufficient[.]” The trial court denied Defendant’s motions. A

jury found Defendant guilty on all counts. Defendant gave notice of appeal in open

court.

 II. Analysis

 Defendant argues on appeal that the trial court erred in: (1) denying her

motions to dismiss the two charges of obstruction of justice for insufficiency of the

evidence; (2) denying her motion to dismiss the accessory after the fact charge for

insufficiency of the evidence; and (3) failing to limit Defendant’s culpable conduct in

its jury instruction for accessory after the fact to her failure to report abuse. While

we hold that the trial court properly denied her motion to dismiss the charge of

obstruction of justice for pressuring her daughter to recant, we agree with Defendant

that the trial court erred in failing to dismiss the remaining charges.

 A. Motion to Dismiss the Charge of Obstruction of Justice by Pressuring the
 Daughter to Recant

 We review a denial of a motion to dismiss for insufficient evidence de novo.

State v. Cousin, 233 N.C. App. 523, 529, 757 S.E.2d 332, 338 (2014) (citation omitted).

Such review is focused on “whether there is substantial evidence (1) of each essential

element of the offense charged . . . , and (2) of defendant’s being the perpetrator[.]”

 - 16 -
 STATE V. DITENHAFER

 Opinion of the Court

State v. Fritsch, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (citation and quotation marks

omitted), cert. denied, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). Our Supreme Court

has defined substantial evidence as “such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.” State v. Smith, 300 N.C. 71, 78-

79, 265 S.E.2d 164, 169 (1980). Such substantial evidence may be “direct,

circumstantial, or both[,]” State v. Locklear, 322 N.C. 349, 358, 368 S.E.2d 377, 383

(1988), and we consider it “in the light most favorable to the State with every

reasonable inference drawn in the State’s favor.” Cousin, 233 N.C. App. at 529-30,

757 S.E.2d at 338 (citing State v. Rose, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994),

cert. denied, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995)).

 Obstruction of justice is generally a common law misdemeanor committed by

one who performed “acts which obstruct, impede or hinder public or legal justice[.]”

State v. Wright, 206 N.C. App. 239, 242, 696 S.E.2d 832, 835 (2010) (citation and

quotation marks omitted). However, N.C. Gen. Stat. § 14-3(b) (2015) states that “[i]f

a misdemeanor offense as to which no specific punishment is prescribed be infamous,

done in secrecy and malice, or with deceit and intent to defraud, the offender shall

. . . be guilty of a Class H felony.” The elements of felony obstruction of justice are

therefore (1) unlawfully and willfully (2) acting to prevent, obstruct, impede, or hinder

justice (3) in secret and with malice or with deceit and intent to defraud. See, e.g.,

Cousins, 233 N.C. App. at 531, 757 S.E.2d at 339 (holding no error in denying a

 - 17 -
 STATE V. DITENHAFER

 Opinion of the Court

motion to dismiss a charge of felony obstruction of justice where there was sufficient

evidence the defendant “(1) unlawfully and willfully (2) obstructed justice by

providing false statements to law enforcement officers investigating [a crime] (3) with

deceit and intent to defraud”).

 This State’s appellate courts have recognized “‘a policy against parties

deliberately frustrating and causing undue expense to adverse parties gathering

information about [wrongdoing.]’” Wright, 206 N.C. App. at 242, 696 S.E.2d at 835

(quoting Henry v. Deen, 310 N.C. 75, 87-88, 310 S.E.2d 326, 334-35 (1984)). Thus, a

person obstructs justice, in either the civil or criminal context, “‘[w]here, as alleged

here, a party deliberately [acts] to subvert an adverse party’s investigation of

[wrongdoing.]’” Wright, 206 N.C. App. at 242, 696 S.E.2d at 835 (quoting Henry, 310

N.C. at 87-88, 310 S.E.2d at 334-35) (first alteration in original).

 Defendant argues there was insufficient evidence of any willful intent on the

part of Defendant to obstruct justice in encouraging the daughter to recant.

Specifically, Defendant contends that “the only ‘purpose’ the State’s evidence showed

[Defendant] acted with was the purpose of getting [the daughter] to tell what

[Defendant] believed was the truth[,]” and that “[t]he State’s evidence does not

support a conclusion that [Defendant] was encouraging [the daughter] to recant with

the willful intent to . . . hinder the investigation of [the daughter’s] allegations.” We

disagree.

 - 18 -
 STATE V. DITENHAFER

 Opinion of the Court

 The daughter testified at length about Defendant’s actions pressuring her to

recant. The State’s evidence showed that Defendant did more than simply encourage

the daughter to tell the truth — an act that certainly would not constitute obstruction

of justice on its own. Defendant directed the daughter specifically to aver that

William had not, as a matter of fact, abused her. When the daughter did not make

the specific factual statement to investigators desired by Defendant, Defendant

actively punished her, verbally abused her, and turned her immediate family against

her. Defendant did so even after she admitted to Detective Doremus and Ms.

Dekarske that she believed the daughter had been abused. Defendant coached the

daughter on what to say in person, on the telephone, and in emails in order to recant.

 This evidence was sufficient to allow a reasonable juror to infer that

Defendant’s conduct was designed to effect a particular outcome — the end of the

criminal and administrative investigation that Defendant believed was “tearing

apart her family and destroying her family” and “going to [cause the family to] lose

[their] money and . . . stuff and the[ir] animals” — directly contrary to the State’s

investigative aims of determining whether abuse had occurred and who perpetrated

any abuse. Even after Defendant witnessed first-hand William’s abuse of the

daughter, she declined to report the abuse because it “would cost them more money

and time” and later described the subsequent CPS investigation into that abuse as “a

nightmare.” Viewing all the evidence in the light most favorable to the State and

 - 19 -
 STATE V. DITENHAFER

 Opinion of the Court

giving it the benefit of every reasonable inference drawn therefrom, it was reasonable

for the jury to find that Defendant intended to obstruct justice when she pressured

the daughter to recant, and the trial court did not err in denying the motion to dismiss

the charge for lack of sufficient evidence of this element of the offense.

 Defendant next contends that there was insufficient evidence to support the

conclusion that Defendant’s actions were committed with deceit and the intent to

defraud necessary to elevate the charges to felony obstruction of justice under N.C.

Gen. Stat. § 14-3(b). However, as detailed above, Defendant told Detective Doremus

and Ms. Dekarske that she believed the daughter had been abused by someone but

nonetheless pressured her into recanting in order to halt any investigation into that

abuse. Ms. Guarnaccia testified the daughter told her that Defendant “asked [the

daughter] to lie to [Ms. Guarnaccia], to CPS, to the detectives . . . . [The daughter] felt

she was under a lot of pressure and felt she had to lie.” (emphasis added). When

confronted by Ms. Dekarske about her coercive conduct, Defendant denied pressuring

the daughter. Once again, viewing all the evidence in the light most favorable to the

State and giving it the benefit of every reasonable inference drawn therefrom, it was

sufficient to allow a reasonable inference that Defendant acted with the deceit and

intent to defraud necessary to commit felony common law obstruction of justice.

 B. Defendant’s Motion to Dismiss the Felony Obstruction of Justice Charge for
 Denial of Access

 - 20 -
 STATE V. DITENHAFER

 Opinion of the Court

 Defendant next argues that, because she never denied any request from CPS

or WCSD for an interview with the daughter, no evidence supported the superseding

indictment’s second charge that Defendant obstructed justice by “den[ying] [WCSD]

and [CPS] access to [the daughter], throughout the course of the investigation.” We

agree.

 Defendant is correct that the State presented no evidence of a specific instance

in which Defendant expressly denied a request by WCSD or CPS to interview the

daughter. Indeed, Ms. Dekarske testified that Defendant “allowed me access to [the

daughter] and also to speak with [her]. There was never a time that [Defendant] did

not allow me access to [the daughter].” Similarly, the State concedes that Defendant

allowed Detective Doremus to meet with the daughter on multiple occasions without

Defendant being present, and there is no evidence in the record demonstrating that

a request to interview, meet, or contact the daughter by Detective Doremus was ever

denied by Defendant.

 The State nevertheless argues that WCSD and CPS were denied “full access”

because Defendant was present in many interviews. But the delineation between

“access” as alleged in the indictment and “full access” as advanced by the State on

appeal would create an unworkable distinction in our jurisprudence. If WCSD and

CPS believed that Defendant’s presence in any interview constituted interference,

they could have asked Defendant to leave. If Defendant, in exercising her rights as

 - 21 -
 STATE V. DITENHAFER

 Opinion of the Court

a parent, refused such a direct request, WCSD and CPS could have sought a court

order compelling her nonattendance. N.C. Gen. Stat. § 7B-303(a) (2015) (“If any

person obstructs or interferes with an assessment . . . the director may file a petition

naming that person as respondent and requesting an order directing the respondent

to cease the obstruction or interference.”). Detective Doremus appeared well aware

of WCSD’s and CPS’s ability to do so, telling Defendant outright that she could not

prohibit his speaking with the daughter alone.

 In short, there is no evidence that tends to show Defendant ever “denied

[WCSD] and [CPS] access to [the] daughter . . . throughout the course of the

investigation” as alleged in the indictment. Defendant complied with every request

for CPS, counselors and WCSD to interview the daughter. Though she was present

at many interviews and unilaterally ended one, she was within her rights as a parent

to do so, and neither WCSD nor CPS sought to mitigate or curtail such conduct by

Defendant. In the light most favorable to the State, the evidence was insufficient to

send the felony obstruction of justice charge for denial of access, as set forth in the

indictment, to the jury, and the trial court erred in denying her motion to dismiss this

count. In vacating Defendant’s conviction for obstruction of justice, we do not decide

whether Defendant’s acts of interference — including speaking over the daughter to

answer investigators’ questions, telling investigators that the daughter was not to be

believed, and abruptly removing the daughter from one interview after learning that

 - 22 -
 STATE V. DITENHAFER

 Opinion of the Court

she was not recanting and was being asked to authenticate material documentary

evidence — could have supported an obstruction charge. But that conduct was not

within the scope of the plain meaning of denying investigators “access” to the

daughter, as alleged in the indictment.

 C. Defendant’s Motions to Dismiss the Accessory After the Fact Charge

 Defendant identifies two grounds for this Court to hold that the trial court

erred in denying her motion to dismiss the accessory after the fact charge. First, she

argues that merely failing to report a crime does not render a defendant an accessory

after the fact, and the State therefore failed to prove any actus reus. Second, and

assuming that Defendant’s failure to report was not culpable conduct, Defendant

argues that evidence that she destroyed evidence and discouraged others from

reporting abuse is a fatal variance from the conduct alleged in the charging document.

We agree with Defendant’s first argument and therefore do not reach her fatal

variance argument.

 N.C. Gen. Stat. § 14-7 provides that “[i]f any person shall become an accessory

after the fact to any felony, whether the same be a felony at common law or by virtue

of any statute made, . . . such person shall be guilty of a crime[.]” N.C. Gen. Stat. §

14-7 (2015). To support a conviction under the statute, the State must prove three

elements: “(1) a felony was committed; (2) the accused knew that the person he

received, relieved or assisted was the person who committed the felony; and (3) the

 - 23 -
 STATE V. DITENHAFER

 Opinion of the Court

accused rendered assistance to the felon personally.” State v. Earnhardt, 307 N.C.

62, 68, 296 S.E.2d 649, 653 (1982) (citations omitted). “[P]ersonal assistance in any

manner so as to aid a felon in escaping arrest or punishment is sufficient to support

a conviction as an accessory.” State v. Brewington, 179 N.C. App. 772, 776, 635 S.E.2d

512, 516 (2006) (citations omitted).

 Defendant takes no issue with the sufficiency of the State’s evidence as to the

first two elements — the commission of a felony and her knowledge of the

perpetrator.1 She instead argues that merely failing to report a crime, in and of

itself, is not enough to support a conviction for accessory after the fact. Both

Defendant and the State, which disagrees with Defendant’s argument, cite our

Supreme Court’s decision in State v. Potter, 221 N.C. 153, 19 S.E.2d 257 (1942), as

dispositive of the issue.

 In Potter, the defendant witnessed an assault and drove the assailant away

from the scene of the crime in his car. Id. at 154, 19 S.E.2d at 258. The defendant

was interrogated by police, and denied that the assault had occurred and that he had

given a ride to the perpetrator. Id. at 155, 19 S.E.2d at 258. The defendant was

convicted as an accessory after the fact. Id. On appeal, our Supreme Court noted

 1 William was arrested and ultimately pleaded guilty to six felony charges arising from his
abuse of the daughter. In re W.C.D., 793 S.E.2d 286, No. COA16-351, 2016 WL 6695866 *1 (N.C. Ct.
App. Nov. 15, 2016). William is currently serving a minimum of 192 months and a maximum of 291
months in prison from his guilty plea. Id. at *1. Therefore, there is no issue as to the felony underlying
the accessory after the fact charge against Defendant, and she raised none on appeal.

 - 24 -
 STATE V. DITENHAFER

 Opinion of the Court

that “one [is not] an accessory after the fact who, knowing that a crime has been

committed, merely fails to give information thereof[.]” Id. at 156, 19 S.E.2d at 259

(internal quotation marks and citation omitted). The Court further explained,

however, that

 the concealment of knowledge of the fact that a crime has
 been committed, or the giving of false testimony as to the
 facts is made for the purpose of giving some advantage to
 the perpetrator of the crime, not on account of fear, and for
 the fact of the advantage to the accused, the person
 rendering such aid is an accessory after the fact.

Id. (internal quotation marks and citation omitted). As a result, the Supreme Court

upheld the conviction. Id.

 The State contends the above language in Potter criminalizes the inaction or

omission of failing to report in the present case. We disagree. Potter involved

affirmative actions on the part of the defendant who rendered personal assistance to

the perpetrator, including acting as a getaway driver and denying any knowledge of

a crime to police when asked by police. Id. at 154-55, 19 S.E.2d at 258. Subsequent

cases similarly criminalize only such active conduct. See, e.g., State v. Hicks, 22 N.C.

App. 554, 557, 207 S.E.2d 318, 320 (“Merely concealing knowledge regarding the

commission of a crime or falsifying such knowledge does not cause a person to become

an accessory after the fact.”), cert. denied, 285 N.C. 761, 209 S.E.2d 286 (1974);

Earnhardt, 307 N.C. at 69, 296 S.E.2d at 653 (holding evidence that defendant was

“concocting a tale” supported a charge of accessory after the fact).

 - 25 -
 STATE V. DITENHAFER

 Opinion of the Court

 The dissenting opinion cites State v Wright, 206 N.C. App. 239, 696 S.E.2d 832

(2010) to support the position that this Court has upheld omissions as felonies. While

the defendant in Wright did fail to report certain campaign contributions — an

omission — he also actively filed a campaign disclosure form that was “not complete,

true, and correct.” Id. at 248, 696 S.E.2d at 838. It was both the concealment and

the filing of an incomplete report that lead to his indictment and subsequent

conviction for obstruction of justice, not merely his omission.

 Here, the indictment charging Defendant as an accessory after the fact “by not

reporting” William’s abuse of the daughter is contrary to our precedent. And while it

is true that North Carolina mandates reporting of actual or suspected child abuse

and criminalizes a breach of this duty as a misdemeanor, N.C. Gen. Stat. § 7B-301

(2015), Defendant was not charged with violation of this statute in her indictment.

As written, the indictment in the present case fails to allege any criminal conduct on

the part of Defendant, and we hold that the trial court erred in denying Defendant’s

motion to dismiss this charge.

 Our decision vacating Defendant’s conviction for accessory after the fact is

based upon the failing in the indictment, which alleges a crime based upon a mere

omission, contrary to precedent. We do not address whether Defendant’s affirmative

acts, such as destroying physical evidence of William’s sexual activity with the

daughter and of telling investigators that the later report of abuse was just “more

 - 26 -
 STATE V. DITENHAFER

 Opinion of the Court

lies” by the daughter, would support an accessory charge, because those activities are

plainly beyond the scope of the charge stated in the indictment.

 III. Conclusion

 For the foregoing reasons, we hold that the trial court did not err in denying

Defendant’s motion to dismiss her charge for felony obstruction of justice by

pressuring the daughter to recant. However, we do hold that the trial court erred in

denying Defendant’s motions to dismiss the remaining charges for felony obstruction

of justice and accessory after the fact.

 NO ERROR IN PART, REVERSED IN PART.

 Judge TYSON concurs.

 Judge INMAN concurs in part and dissents in part with separate opinion.

 - 27 -