IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 19-365

Filed: 31 December 2020

Wake County, No. 17 CRS 1878

STATE OF NORTH CAROLINA,

v.

WALLACE BRADSHER, Defendant.

Appeal by Defendant from judgment entered 7 September 2018 by Judge Paul C. Ridgeway in Superior Court, Wake County. Heard in the Court of Appeals 7 January 2020.

> *Attorney General Joshua H. Stein, by Deputy Solicitor General James W. Doggett for the State.*

> *Assistant Appellate Defender Michele A. Goldman and Appellate Defender Glenn Gerding, for Defendant.*

McGEE, Chief Judge.

Wallace Bradsher ("Mr. Bradsher" or "Defendant Bradsher") was indicted by a grand jury in a superseding indictment on 24 October 2017 charging him with conspiracy to commit the offense of obtaining property by false pretenses, obtaining property by false pretenses, aiding and abetting the offense of obtaining property by false pretenses, three counts of obstruction of justice, and failure to discharge the duties of his office. The case was tried at the 29 May 2018 session of Superior Court, Wake County. At trial, Defendant Bradsher, representing himself, moved to dismiss

all charges at the close of the State's evidence. The motion to dismiss was denied. Defendant Bradsher declined to present any evidence. A jury found Defendant Bradsher not guilty of conspiracy to commit the offense of obtaining property by false pretenses and one count of obstruction of justice. The jury found Defendant guilty of one count of felony obstruction of justice, one count of misdemeanor obstruction of justice, two counts of obtaining property by false pretenses, and one count of failure to discharge the duties of his office. The trial court arrested judgment on the count of obtaining property by false pretenses based on the theory of acting in concert, but entered judgment on the count of aiding and abetting obtaining property by false pretenses.

## I. Factual and Procedural History

Mr. Bradsher was elected to the position of district attorney for Prosecutorial District 9A, comprised of Person and Caswell Counties, and assumed office on 1 January 2011. Prior to his election, Mr. Bradsher was a criminal defense attorney in private practice and employed his wife, Pam Bradsher ("Ms. Bradsher"), at his law office. When he became district attorney, Mr. Bradsher hired Ms. Bradsher to work as support staff in his district attorney's office.

In 2013, Craig Blitzer ("Mr. Blitzer"), was a criminal defense attorney in private practice considering running for district attorney for Prosecutorial District

17A, composed solely of Rockingham County, just west of District 9A. Like Mr. Bradsher, Mr. Blitzer's wife, Cindy Blitzer ("Cindy or Ms. Blitzer"), worked at his law firm in private practice. Mr. Blitzer was aware that Ms. Bradsher worked for Mr. Bradsher in the neighboring prosecutorial district and Mr. Blitzer hired his wife to work on his support staff in his district attorney's office. He asked Mr. Bradsher whether he had any issues employing his wife at the district attorney's office and Mr. Bradsher said he did not.

Mr. Blitzer did run for the district attorney seat and was elected in 2014. Ms. Blitzer was close to finishing nursing school, but quit school to help Mr. Blitzer with his campaign. After taking office, Mr. Blitzer hired Ms. Blitzer to work for him in his district attorney's office.

The North Carolina Administrative Office of the Courts ("AOC") soon noticed both Mr. Blitzer and Mr. Bradsher had employed their wives in their respective offices. Margaret Wiggins ("Ms. Wiggins"), AOC's Human Resources Officer, emailed both Mr. Bradsher and Mr. Blitzer on 8 January 2015, and informed each that hiring their wives violated the anti-nepotism laws of the State Ethics Act and they were not permitted to do so. Ms. Wiggins suggested they seek a waiver from the State Ethics Commission if they wanted to continue to employ their own wives.

As a result of the information from Ms. Wiggins, Mr. Bradsher sought a waiver of the State Ethics Act from the Commission so he could continue Ms. Bradsher's

employment.  Mr. Bradsher and Mr. Blitzer were told they could not employ their own wives while awaiting a decision on a waiver request.  Mr. Bradsher suggested, as an interim solution, that he and Mr. Blitzer could hire each other's wife as an employee.  Both hoped the employment change would be temporary.  Mr. Bradsher sought approval from Ms. Wiggins who, after consulting with counsel for AOC, approved the plan because it did not violate the Act.

The Bradshers and the Blitzers met at a restaurant to discuss the plan.  At the meeting, Mr. Blitzer told Mr. Bradsher that Ms. Blitzer wanted to return to school to complete her nursing degree eventually.  Mr. Bradsher said he would try to help Ms. Blitzer finish her nursing degree at a community college.

Ms. Bradsher quit her job in district 9A and was hired in district 17A.  At the same time, Ms. Blitzer quit her job in district 17A and was hired in district 9A.  As an employee of Mr. Bradsher, Ms. Blitzer initially worked in a secondary office located in Caswell County, which was closer to the Blitzers' residence in Rockingham County.  Her supervisor was an assistant district attorney, John Stultz III ("Mr. Stultz"), who was in charge of that office.  As her supervisor, Mr. Stultz was responsible for approving Ms. Blitzer's hours in BEACON, the timekeeping and payroll system used by AOC.  Ms. Blitzer would submit her hours worked in BEACON for Mr. Stultz's approval.

Five weeks after beginning work at the District 9A Caswell office, Ms. Blitzer decided the office arrangement was unacceptable. She testified that she "had no space to work[,]" lacked a computer, and that the commute was too long. She discussed these issues with Mr. Stultz and with her husband, Mr. Blitzer. She asked Mr. Blitzer to discuss the issue with Mr. Bradsher. At trial, she testified her husband said he spoke with Mr. Bradsher and he said she could work out of the Rockingham County office of Prosecutorial District 17A while still being employed by District 9A. She testified she was happy about the change because the new location "was air conditioned and cool in that office and there was a desk and an office for [her] to work in with a computer[,]" and "it was much closer to home[.]" She testified she was also permitted to work at home if needed.

Ms. Blitzer testified that, while she was working in the Caswell office, she would "go to the courtroom with Mr. Stultz and [] speak to victim witnesses, basically anything Mr. Stultz needed [her] to do." As part of her job responsibilities, both before and after the change, Ms. Blitzer was asked to work on cases that District 17A had transferred to 9A because of conflicts of interest that prevented Mr. Blitzer from working on them. One of her responsibilities was a "conflict case" involving an infant homicide called the Shockley case. Mr. Stultz was the attorney assigned to the Shockley case. Ms. Blitzer testified she organized the "extensive" evidence for the Shockley case.

The summer of 2015, the State Ethics Commission informed Mr. Bradsher the State Ethics Act's anti-nepotism laws were not waivable. Ms. Bradsher soon resigned from Mr. Blitzer's office and took a new job at a local community college. When Ms. Bradsher resigned, Mr. Blitzer hired Tyler Henderson ("Mr. Henderson"). Although he was employed by District 17A, Mr. Blitzer assigned Mr. Henderson to work in District 9A exclusively on 9A matters. Mr. Blitzer did not supervise Mr. Henderson's work. Ms. Blitzer, meanwhile, was still employed by District 9A but working in 17A.

Sometime in 2015, an assistant district attorney in Mr. Blitzer's office told the State Bureau of Investigation ("SBI") that Ms. Blitzer was not working the hours she said she was and the SBI began investigating. Mr. Blitzer learned about the investigation in December 2015, but did not tell his wife or Mr. Bradsher about it. The 2015 investigation was quickly dropped, but a subsequent internal SBI investigation did not explain why.

Mr. Stultz asked Mr. Bradsher to reassign the Shockley case in August 2015 and Mr. Bradsher took over the case himself. In early March 2016, Mr. Bradsher and Mr. Henderson went to the District 17A office, where Ms. Blitzer worked, to get the Shockley case file from her in order to prepare the case for trial. Mr. Blitzer testified that he told Mr. Bradsher about the 2015 SBI investigation that day. According to Mr. Blitzer, Mr. Bradsher told him to vary Ms. Blitzer's time by entering vacation and sick time. Time records produced by AOC and introduced at trial however,

- 6 -

indicated that the only varied hours entered by Ms. Blitzer occurred between 21 January and 17 February 2016. Mr. Blitzer testified that Ms. Blitzer worked the hours entered into BEACON until the Shockley case file was taken in March 2016, but after that, Ms. Blitzer "had nothing to do." Although Ms. Blitzer testified she tried to call Mr. Bradsher about having nothing to do, she did not recall whether she left a message and did not recall sending him any text messages. She then testified she thought she probably did leave him a message but did not remember what she said and afterward solely relied on her husband to communicate with Mr. Bradsher.

Ms. Blitzer had always planned to return to school to complete her nursing degree. Ms. Blitzer learned that, despite Mr. Bradsher's efforts, she would not be able to complete her nursing degree at Person Community College as he had suggested, because, after she completed the required testing, they wanted her to retake almost half the curriculum she had already completed before she withdrew from her previous program. Ms. Blitzer was unwilling to do so. She began exploring other ways to finish her degree and chose to apply to an accelerated nursing program which required her to retake some classes. Ms. Blitzer began online courses while still employed by District 9A and working in District 17A. Mr. Blitzer directed two of his employees to help Ms. Blitzer complete the online courses by logging into Ms. Blitzer's online account and helping her complete homework and a test during work hours.

In April 2016, soon after the Shockley case file was taken by Mr. Bradsher, Ms. Blitzer enrolled in a full-time nursing program at South University physically located in High Point, North Carolina, while still being employed by the State. She took courses there four days a week. Although she was not working during this time, Ms. Blitzer continued entering hours into BEACON as though she was working. The time records introduced at trial showed she continued to do so until she left her position.

Mr. Blitzer testified that, during April 2016, he and Mr. Bradsher traveled together to a statewide meeting of the Conference of District Attorneys in Ocracoke, North Carolina. During the drive to the meeting, Mr. Blitzer told Mr. Bradsher, "[Ms. Blitzer] ha[d] no work because you took the Shockley case and no one is calling her back as to what to do." Mr. Blitzer testified that Mr. Bradsher's "response was to just have her concentrate on school and he'd get back with her." Mr. Blitzer testified Ms. Blitzer never received any further work from Mr. Bradsher after that conversation. He testified that, to the best of his knowledge, his wife was still inputting hours as if she were working. He testified he did not bring the issue up again with Mr. Bradsher until October 2016.

Mr. Blitzer further testified he and his wife were experiencing financial difficulties that were not resolved during this time and that they still needed Ms. Blitzer's paycheck. Ms. Blitzer testified she continued to submit hours without working because "[she] needed a job and we had bills to pay." Mr. Blitzer

acknowledged their financial difficulties contributed to his decision not to say anything about "this nonwork issue" to Mr. Bradsher.

In April 2016, the assistant district attorney who originally reported a problem with Ms. Blitzer's hours to the SBI again reported to the SBI that Ms. Blitzer was attending school during work hours. The SBI opened a new investigation led by SBI Agent David Whitley ("Agent Whitley"). Agent Whitley interviewed two 17A assistant district attorneys about Ms. Blitzer's work hours and another SBI agent watched Ms. Blitzer attend classes at South University during work hours.

Mr. Blitzer learned about the new SBI investigation in June 2016 and, although he consulted an attorney, he did not tell Ms. Blitzer or Mr. Bradsher about the investigation. Agent Whitley contacted Mr. Bradsher and they had a phone conversation during which Agent Whitley told Mr. Bradsher about the complaint regarding Ms. Blitzer's payment for hours not worked and they also arranged a time for Agent Whitley to interview Mr. Bradsher on 6 September 2016.

Mr. Bradsher called Mr. Stultz into his office on 15 August 2016 and told him the SBI was investigating Ms. Blitzer's hours. Mr. Stultz mistakenly believed he was no longer required to approve Ms. Blitzer's hour submissions on BEACON and had not done so since March 2016. He told Mr. Bradsher he could approve the hours Ms. Blitzer had submitted since his last approval, but before doing so he asked Mr.

Bradsher if Ms. Blitzer was still doing the shared-employee program. Mr. Bradsher responded that she was. Mr. Stultz logged onto BEACON and approved the hours.

Agent Whitley interviewed Mr. Bradsher on 6 September 2016 in Mr. Bradsher's office and told him the SBI was investigating whether Ms. Blitzer was working the hours she claimed. Agent Whitley testified that Mr. Bradsher told him that Ms. Blitzer worked on conflict cases with Mr. Stultz, did special projects assigned by Mr. Bradsher, and helped with District 17A matters under a shared-employee program arranged between the two districts and modeled after a federal shared-employee program between state prosecutors and federal U.S. Attorney offices. Agent Whitley testified that Mr. Bradsher said Ms. Blitzer worked under that program as an employee of 17A while working in 9A.

During the interview, Mr. Bradsher identified for Agent Whitley employees who worked or had contact with Ms. Blitzer. Agent Whitley asked for additional information about the special projects Mr. Bradsher said he assigned Ms. Blitzer, but Mr. Bradsher told Agent Whitley he could not recall further details. Mr. Bradsher said he would check with Ms. Blitzer, but Agent Whitley told him not to contact her. At trial, Ms. Blitzer testified she had never been assigned any special projects. Agent Whitley testified the "overall impression [Mr. Bradsher] gave [him] was that [Ms. Blitzer] was working[,]" but his impression was not tied to any particular statement made by Mr. Bradsher. He testified that if Mr. Bradsher provided information

- 10 -

showing Ms. Blitzer was working, the investigation would have been shorter. The investigation continued into 2017, with Agent Whitley interviewing Mr. Bradsher's employees over several weeks to determine the extent to which Ms. Blitzer was working.

The Blitzers they contacted Mr. Bradsher in October 2016 and Ms. Blitzer said she wanted to resign following media scrutiny of her employment. The Blitzers both testified Mr. Bradsher told Ms. Blitzer not to resign. The Blitzers also both testified Mr. Bradsher told Ms. Blitzer to keep entering hours into BEACON and that he would tell investigators she had been working on special projects. Ms. Blitzer testified she continued to submit time for hours she never worked.

Gayle Peed ("Ms. Peed"), Mr. Bradsher's administrative assistant, testified that on 24 October 2016, Mr. Bradsher directed her to call Ms. Blitzer and fire her effective that day because Ms. Blitzer would not speak with him. She did so. Ms. Peed also testified that, at Mr. Bradsher's instruction, she responded to an email from AOC regarding Ms. Blitzer's time record. Ms. Peed testified that Ms. Blitzer never responded to a request to verify her hours and that, according to Mr. Bradsher's direction, the reply email informed AOC that "[Mr. Bradsher and she] couldn't certify [Ms. Blitzer's] time because [Ms. Blitzer] was under investigation."

Mr. Blitzer did not give a statement to Agent Whitley until May 2017. Mr. Blitzer pleaded guilty to misdemeanor failure to discharge duties, repaid the State

for $48,000 for the money Ms. Blitzer had wrongfully accrued, consented to suspension of his law license, and agreed to cooperate in the civil and criminal cases against Mr. Bradsher. In exchange, the State agreed to decline any further prosecution of either of the Blitzers for any crimes related to Ms. Blitzer's employment.

A grand jury returned a bill of indictment on 24 October 2017 against Mr. Bradsher with seven counts, charging him with conspiracy to obtain property by false pretenses, failure to discharge his duties, two counts of obtaining property by false pretenses, and three counts of obstructing justice. Mr. Bradsher was tried on the charges on 29 May 2018 in Superior Court, Wake County.

During the State's case, the trial court excluded testimony from Ms. Peed as hearsay, which ruling Mr. Bradsher challenges on appeal. After the State rested, Mr. Bradsher moved to dismiss each count based on insufficiency of evidence. The trial court denied his motion to dismiss. Mr. Bradsher declined to present his own evidence. At the close of all evidence, Mr. Bradsher renewed his motion to dismiss, which was again denied.

On 18 June 2018, the jury found Mr. Bradsher not guilty of conspiracy to commit the offense of obtaining property by false pretenses and one count of obstructing justice, but found him guilty of failure to discharge his duties, felony obstruction of justice based on the provision of false information to Agent Whitley,

misdemeanor obstruction of justice based on the provision of false information to Mr. Stultz, obtaining property by false pretenses based on the theory of acting in concert, and aiding and abetting the obtaining of property by false pretenses. The trial court arrested judgment on the count of obtaining property by false pretenses based on the theory of acting in concert, due to double jeopardy concerns. The trial court entered judgment on the count of aiding and abetting obtaining property by false pretenses. The trial court sentenced Mr. Bradsher to 4 to 14 months imprisonment for the aiding and abetting conviction, consolidated the charges of felony obstruction of justice, misdemeanor obstruction of justice, and failure to discharge duties, and sentenced him to a term of 6 to 17 months, which was suspended for 24 months of supervised probation pending the submission of a DNA sample imposed based on those charges. Mr. Bradsher appeals.

## II. Analysis

Defendant Bradsher argues four issues on appeal: (1) "[t]he State failed to prove [Defendant] impeded, delayed, and obstructed the investigation by intentionally making false statements to Agent Whitley on 6 September 2016"; (2) "[t]he trial court erred in excluding [Ms.] Peed's testimony about [Defendant]'s statements"; (3) "[t]he trial court plainly erred in failing to instruct the jury on the specific false representations alleged in the indictment"; and (4) "[t]he State failed to

establish [Defendant] personally committed or acted in concert to commit obtaining property by false pretenses."

## A. Obstruction of Justice

Defendant argues the trial court erred in denying his motion to dismiss the charge of felony obstruction of justice for insufficient evidence on the grounds that "the State failed to prove Defendant impeded, delayed, and obstructed the investigation by intentionally making false statements to Agent Whitley on 6 September 2016." After reviewing the arguments and the record, we agree.

"At common law it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice. If common law obstruction of justice is done 'with deceit and intent to defraud' it is a felony." *State v. Ditenhafer*, 373 N.C. 116, 128, 834 S.E.2d 392, 400 (2019). "The elements of common law felonious obstruction of justice are: (1) the defendant unlawfully and willfully; (2) obstructed justice; (3) with deceit and intent to defraud." *State v. Cousin*, 233 N.C. App. 523, 537, 757 S.E.2d 332, 342-43 (2014) (cited in *Ditenhafer*, 373 N.C. at 128, 834 S.E.2d at 400).

Defendant argues the State failed to produce any evidence of the obstructive act alleged in the indictment. Our Supreme Court has long held that "[i]t is error, generally prejudicial, for the trial judge to permit a jury to convict upon a theory not supported by the bill of indictment." *State v. Brown*, 312 N.C. 237, 248, 321 S.E.2d

856, 863 (1984); *see also Ditenhafer*, 373 N.C. at 126, 834 S.E.2d at 399 (declining to consider any of the defendant's acts not specifically alleged in indictment). Count V of the indictment alleged that Defendant "commit[ted] the infamous offense of obstruction of justice by knowingly and intentionally providing false and fabricated statements to [Agent] Whitley . . . designed to mislead the agent thereby impeding, delaying and obstructing the investigation, and legal and public justice." Defendant argues that the State failed to introduce any evidence showing Mr. Bradsher made any specific false or fabricated statement and, instead, that Agent Whitley testified the conversation merely left him with the "overall impression" that Ms. Blitzer was actually working. The State argues that Mr. Bradsher's statements to Agent Whitley that Ms. Blitzer "worked on conflict cases" and that Ms. Blitzer "worked on special projects" that "he had assigned to her" were false.

Without specifying a particular time period, the statement that Ms. Blitzer "worked on conflict cases" was not false. Although the statement omits that Ms. Blitzer had not worked on a conflict case for five months at the time of the conversation, that makes the statement at most misleading, not false. Because the indictment did not allege Mr. Bradsher obstructed justice through an omission, but through false or fabricated statements, we cannot consider this statement.

There is, however, conflicting evidence about whether Mr. Bradsher's statement to Agent Whitley that Ms. Blitzer "worked on special projects" assigned by

Mr. Bradsher was false. Mr. Bradsher claimed to Agent Whitley that Ms. Blitzer worked on special projects, but the Blitzers both denied that she did. When asked by Agent Whitley what special projects Ms. Blitzer worked on, Mr. Bradsher could not recall details. Taking the evidence in the light most favorable to the State, we assume Mr. Bradsher's statement was false.

Even assuming the statement was false, however, the State must still show Defendant Bradsher "obstructed justice" through the false statement. The State argues, relying on *State v. Cousin*, 233 N.C. App. 523, 757 S.E.2d 332 (2014), that "when persons knowingly provide false statements to law enforcement, they obstruct justice." In *Cousin*, this Court held that the evidence supported a conviction for obstruction of justice where the defendant gave eight written statements to law enforcement in connections with a homicide identifying various alternating persons as the killer. *Id.* at 530-31, 757 S.E.2d at 338-39. The detective "testified as to the significant burden imposed on the investigation," including following up with each person and determining they each had an alibi and were not present at the scene of the crime. *Id.* at 531, 757 S.E.2d at 339.

In the present case, Agent Whitley testified his "investigative path" was to document any work Ms. Blitzer "may have actually done." Agent Whitley testified he sought in the interview with Mr. Bradsher "to answer some basic questions: where [Ms.] Blitzer was located, who her supervisor was, what type of work she did, that

type of thing." Agent Whitley followed up with several employees Ms. Blitzer had worked with, a process that took a "couple of weeks." He acknowledged his follow-up interviews with Ms. Blitzer's co-workers were based on Mr. Bradsher's truthful response to the question of which people she had worked and interacted with, not any misstatement he made. Agent Whitley did not testify he specifically asked Mr. Bradsher if Ms. Blitzer was currently working—he merely testified the interview left him with that "general impression." Although Mr. Bradsher's statement about special projects may have been misleading, there is no evidence it changed Agent Whitley's "investigative path" or extended his investigation beyond what it would have ordinarily taken. This is short of the burden imposed by the defendant's false statements in *Cousin* and does not show actual obstruction of the investigation.

The State alternatively argues that "[o]bstruction occurs whenever a person acts intentionally to hinder justice." However, this is not a correct statement of the law. To support a conviction for obstruction of justice, the State must establish substantial evidence for every element of the crime, including that the act in question "obstructed justice[.]" *Cousin*, 233 N.C. App. at 537, 757 S.E.2d at 342-43. We hold the State did not provide substantial evidence of obstruction to support the conviction for felony obstruction of justice in this case.

*B. Exclusion of Ms. Peed's Testimony about Mr. Bradsher's Statements*

Defendant next argues the trial court erred in excluding Ms. Peed's testimony about his statements to her as hearsay. At trial, Mr. Bradsher sought to elicit testimony from Ms. Peed, his administrative assistant, about an email sent to AOC based on Mr. Bradsher's instruction not to certify Ms. Blitzer's last set of hours, when Ms. Blitzer did not respond to an inquiry about whether the hours were valid. Defendant contends the email tended to show he did not know that Ms. Blitzer was submitting false hours in her BEACON entries.

The following exchange occurred on cross-examination of Ms. Peed by Mr. Bradsher:

> [Mr. Bradsher]: Okay. Do you recall, on a form tendered by AOC, the District 9A's position about approving [Ms. Blitzer's] hours and [Ms. Blitzer's] lack of response?
>
> [Prosecutor]: Objection.
>
> THE COURT: Sustained
>
> . . .
>
> [Mr. Bradsher]: All right. And after you received [an email from AOC], what did you reply, that you recall?
>
> [Peed]: That I had not received – we had not received any response from Cindy Blitzer and she was under investigation and so we couldn't –
>
> [Prosecutor]: Objection[.]

At that point, the trial court excused the jury for voir dire of Ms. Peed. Ms. Peed responded to the prosecutor's question about the source of the information in the email as follows:

> After I talked with Mr. Bradsher – I showed him the email that [AOC] sent. Initially, the first time it was sent, [Mr. Bradsher] told me to email Ms. Blitzer and see if we could get her to certify those hours. Some time later [AOC] sent the email back again asking for a response, and . . . I took that to [Mr. Bradsher] and said, "Cindy Blitzer never responded." And [Mr. Bradsher] told me to tell [AOC] we couldn't certify the time because [Ms. Blitzer] was under investigation. So[,] I answered the email in that way.

Ms. Peed agreed that "[i]t was not [her] decision to send this email of [her] own volition and [her] decision as to what [she] w[as] going to put in the email; it was based upon the direction of [Mr. Bradsher][.]" Mr. Bradsher argued Ms. Peed's testimony about the content of the email was permissible alternatively because it fell under the business record exception, and because the State opened the door because the prosecutor asked Ms. Peed about other statements Mr. Bradsher made to her. He also said the statement was "not hearsay." The trial court held that the message to AOC was hearsay and did not admit it.

"'Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2019). On appeal, Defendant argues the trial court erred in excluding the testimony because the statement was not hearsay as it

was testimony of a direction or command. He argues Ms. Peed's testimony about Defendant's statements to her are not hearsay because they are directions. Defendant cites *State v. Mitchell*, 135 N.C. App. 617, 619, 522 S.E.2d 94, 95 (1999), in which this Court held directions, commands, and suggestions are not hearsay because "they are simply offered to prove that the directive was made, not to prove the truth of any matter asserted therein."

We note the State contends Defendant's argument that Ms. Peed's testimony is not hearsay because it is a direction is not preserved. To preserve an argument regarding the admissibility of evidence, a party "must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1) (2019). The State argues that Defendant never argued before the trial court that the statement was not hearsay because it was a direction. The State acknowledged Defendant's assertion that the statement was "not hearsay," but argues he did not explain this statement further at trial and later conceded it was hearsay because he wanted to admit the statement to show "the truth of what happened."

Defendant in turn argues that his statement at trial that the challenged testimony was "not hearsay" was sufficient to preserve the argument that it was a command for appeal because "Mr. Bradsher alerted the trial court to the theory of

admissibility he raises on appeal and thereby preserved the issue for appellate review."

After reviewing the trial transcript, we hold Defendant's argument is not preserved. In arguing for admission of the testimony, Defendant does in passing state the testimony is "not hearsay," but he does not explain why and the basis of the argument is not apparent from the circumstances. In context, Defendant makes the following arguments:

> Your honor, first of all, I think [the statement] could fall within a business record exception.
>
> Second of all, the State, in issue of fundamental fairness, has asked Ms. Peed other statements that I have made. In an attempt to clarify and cross-examine what the State has raised, I believe, even if deemed hearsay, this would be admissible.
>
> I also contend to the court in [cross-examination of an AOC staff member], I specifically addressed this in cross-examination. And her response, not in response to any question, was, "If such document exists." So that has been put out in front of the jury through a State's witness in cross-examination of [the employee] about first the effect of BEACON, the effect of the approval of BEACON and then specifically about the nonresponse.
>
> Ms. Blitzer has testified. She indicated she did not respond to that email. And I contend, first of all, that it's not hearsay.
>
> Yes, this is a unique case because I am being charged for conduct in the official capacity as district attorney. And it is alleged that this has been obtained property by false pretenses. And as part of a regular business

> communication between the A[dministrative ]A[ssistant]
> of District 9A and AOC, the administrative assistant
> transfers this information, I contend that it is admissible,
> Your Honor.

It is not clear from Defendant's argument at trial what he means by "it's not hearsay." Defendant begins by arguing for a business record exception and that the State opened the door. He then says it is not hearsay before again arguing it falls under the business record exception. Based on the transcript, it seems likely Defendant was referring exclusively to whether the statement fell under the business record exception, particularly since he made no argument it was not hearsay as a command or under another theory. At no point does he argue the statement was admissible as a direction or a command.

The transcript also suggests that others did not understand it that way. The prosecutor only responded by arguing that the business record exception did not apply, that it did not matter that it occurred during the regular course of business, and that it was not relevant. Finally, although the trial court made a thorough ruling, it did not specifically respond to an argument that the statement was not hearsay because it was a command, instead ruling that it was irrelevant whether it was made in Defendant Bradsher's official capacity and that it was not subject to a business record exception.

"[Our] Court[s] ha[ve] long held that where a theory argued on appeal was not raised before the trial court, 'the law does not permit parties to swap horses

between courts in order to get a better mount . . . ." *State v. Sharpe*, 344 N.C. 190, 473 S.E.2d 3 (1996) (citation omitted). The purpose of preservation rules "is to require a party to call the court's attention to a matter upon which he or she wants a ruling before he or she can assign error to the matter on appeal." *State v. Canady*, 330 N.C. 398, 401, 410 S.E.2d 875, 878 (1991). In *Sharpe*, our Supreme Court held that where the defendant had made arguments for admissibility under two hearsay exceptions before the trial court, the State responded only to those arguments, and the trial court expressly ruled on admissibility only under those grounds, then the defendant could not argue a new ground on appeal. *Sharpe*, 344 N.C. at 195, 473 S.E.2d at 5-6. While Defendant's statement that Ms. Peed's testimony was "not hearsay" is ambiguous, all parties focused on whether the statement was admissible as a business record. Defendant's statement did not adequately call the trial court's attention to the argument he now presents on appeal: that the statement was not hearsay because it was a command. We therefore hold this argument is not preserved for appellate review.

## C. Jury Instruction

Defendant also argues the trial court plainly erred by "failing to instruct the jury on the specific false representations alleged in the indictment." We note Defendant has "specifically and distinctly" contended that the error at issue was plain error, as is required for this Court to review instructional or evidentiary issues not

otherwise preserved on appeal. N.C. R. App. P. 10(a)(4) (2019). Our Supreme Court

has clarified the standard of review for plain error as follows:

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error "had a probable impact on the jury's finding that the defendant was guilty." Moreover, because plain error is to be "applied cautiously and only in the exceptional case," the error will often be one that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations

omitted). "In deciding whether a defect in the jury instruction constitutes 'plain

error', the appellate court must examine the entire record and determine if the

instructional error had a probable impact on the jury's finding of guilt." *State v.*

*Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 378-79 (1983) (citation omitted).

In the present case, Defendant argues the trial court erred in failing to instruct

the jury on what the particular false representations alleged in the indictments were.

The State alleged two counts of obtaining property by false pretenses. On the first

count, the allegation was that Mr. Bradsher and co-conspirators "submitted

fraudulent entries of hours worked for Cindy Blitzer" to AOC. On the other count,

the State had to prove "Cindy Blitzer submitted fraudulent entries of hours worked

for Cindy Blitzer" to AOC.

In *State v. Locklear*, 259 N.C. App. 374, 816 S.E.2d 197 (2018), on which Defendant relies, this Court reasoned and held that "[b]ecause 'a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment,' and 'the state must prove . . . that [the] defendant made the misrepresentation as alleged,' it only makes sense that the trial court must instruct the jury on the misrepresentation as alleged in the indictment." *State v. Locklear*, 259 N.C. App. 374, 383, 816 S.E.2d 197, 204 (2018) (alterations and internal citations omitted). However, "[a] jury instruction that is not specific to the misrepresentation in the indictment is acceptable so long as the court finds 'no variance between the indictment, the proof presented at trial, and the instructions to the jury.'" *State v. Ledwell*, 171 N.C. App. 314, 320, 614 S.E.2d 562, 566 (2005) (citation omitted).

In *Locklear*, the misrepresentation alleged in the indictment was "filing a fire loss claim under the defendant's home owner insurance policy, when in fact the defendant had intentionally burned her own residence." *Id.* at 383-84, 816 S.E.2d at 205. The evidence presented at trial, however, included additional misrepresentations the defendant made to the insurance company. The jury convicted the defendant of obtaining property by false pretenses but acquitted the defendant of setting fire to her home. Based on these conflicting verdicts, this Court held it was likely the jury would have reached a different result had the instruction

on the specific misrepresentation been given and held the trial court plainly erred in failing to do so.

On appeal, Defendant argues that, as in *Locklear*, the jury's verdicts along with the evidence of multiple false representations made at trial, show that had the trial court given the instruction regarding the misstatements alleged, the jury would likely have acquitted Defendant of the charges of obtaining property by false pretenses. Defendant identifies two assertions he argues were "false representations" the State advanced at trial to support the obtaining property by false pretenses charges that were not the false representation alleged in the indictment, that Ms. Blitzer submitted fraudulent hours to AOC: (1) "[Mr.] Stultz approved [Ms. Blitzer's] fraudulent hours;" and (2) "Mr. Bradsher continued to employ [Ms. Blitzer] knowing she was not working or knowing she worked on 17A matters while employed by 9A." The State contends it did not in fact produce evidence of multiple false statements at trial. Rather, the State argues that the statements Defendant claims were evidence of false statements were in fact statements the State contended were true. Thus, according to the State, there was no variance between the false statements alleged in the indictment and the evidence produced at trial, and the jury could not have relied on those alternative statements to determine Defendant obtained property by false pretenses.

First, Defendant argues that one of the alternative statements the State proffered at trial is that Mr. Stultz approved fraudulent hours to the AOC on behalf of Ms. Blitzer. Although, as discussed below, this action was insufficient evidence of Mr. Bradsher's presence at the scene of Ms. Blitzer's crime under an acting in concert theory, it does not follow that the State was advancing an alternative false representation when it alleged Mr. Bradsher urged Mr. Stultz to approve Ms. Blitzer's hours.

Defendant also argues that the State advanced the following allegation as an alternative false representation supporting Defendant's conviction: that Mr. Bradsher "falsely held out Ms. Blitzer as his employee when she actually worked for her husband". In support of this argument, Defendant cites only the following statement made by the prosecutor in the State's closing argument: "I would submit to you that [Mr. Bradsher] does make a representation by her continued employment and having his employees continue to release her time for a period of time to AOC." The prosecutor did not argue this alleged representation was false. To the contrary, the evidence presented at trial showed that Mr. Bradsher acknowledged that Ms. Blitzer was his employee and that all the work she performed as an employee was in the service of Mr. Bradsher's office. Thus, this lone statement cannot serve as an alternative "false representation" to satisfy the obtaining property by false pretenses requirement.

The State further contends that "[i]f any other uncharged false pretenses were discussed at trial, they are irrelevant, because Mr. Bradsher does not maintain that juror confusion about any other false pretenses prejudiced him." Although Defendant argues the State improperly seeks to narrow the field of alternative false statements that could give rise to the jury's verdicts, Defendant makes no other argument as to what these statements might be. "It is not the role of the appellate courts, however, to create an appeal for an appellant." *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005); *see* N.C. R. App. P. 28(b)(6) (2019) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned."). Therefore, we do not consider any statements besides those argued by Defendant in his brief on appeal. We hold the trial court did not err, nor plainly err, in failing to give an instruction about the misrepresentation alleged in the indictment.

D. Obtaining Property by False Pretenses

Defendant also argues the trial court erred in denying his motion to dismiss the charge of obtaining property by false pretenses based on the theory of "acting in concert." As an initial matter, we note the trial court arrested the verdict on this charge after the jury returned verdicts for two counts of obtaining property by false pretenses. For an appeal to be properly before this Court, the appeal must arise from a final judgment entered by the trial court.

"In certain cases, 'an arrest of judgment does . . . have the effect of vacating the verdict,' but 'in other situations an arrest of judgment serves only to withhold judgment on a valid verdict which remains intact.'" *State v. Reeves*, 326 N.C. App. 570, 575, 721 S.E.2d 317, 321 (2012) (quoting *State v. Pakulski*, 326 N.C. 434, 439, 390 S.E.2d 129, 132 (1990)).

In *Pakulski*, our Supreme Court explained this distinction:

> When judgment is arrested because of a fatal flaw which appears on the face of the record, such as a substantive error on the indictment, the verdict itself is vacated and the state must seek a new indictment if it elects to proceed again against the defendant. However, we hold that when judgment is arrested on predicate felonies in a felony murder case to avoid a double jeopardy problem, the guilty verdicts on the underlying felonies remain on the docket and judgment can be entered if the conviction for the murder is later reversed on appeal, and the convictions on the predicate felonies are not disturbed upon appeal.

*Pakulski*, 326 N.C. at 439, 390 at 132; *see also Reeves*, 218 N.C. App. at 575, 721 S.E.2d at 321 ("Whether a verdict has been vacated will determine whether the arrested judgment serves as a final judgment, thus making its appeal before this Court proper."). In *Reeves*, this Court applied *Pakulski* and held that a conviction of reckless driving that was arrested because it was "used to enhance the DWI [conviction]" was a final judgment and thus properly before this Court because it was arrested to avoid double jeopardy concerns and "remain[ed] on the docket and could be revisited on remand." *Reeves*, 218 N.C. App. at 576, 721 S.E.2d at 322.

In the present case, Defendant was indicted on two counts of obtaining property by false pretenses. Count II, in both the arguments made by the State and the instructions given to the jury, was based on a theory of "acting in concert." Count III, on the other hand, was predicated on a theory of aiding and abetting. The jury returned verdicts of guilty on both counts. At trial, the State suggested the trial court should arrest judgment on one of the obtaining property by false pretenses counts "considering the factual allegations." The trial court did arrest judgment on Count II and entered judgment on Count III, the aiding and abetting count. In its brief, the State acknowledges that "[t]he trial court arrested judgment on this count, because the same conduct supported both false-pretenses convictions." It appears from the record that the trial court arrested the verdict to avoid double jeopardy concerns. Therefore, the guilty verdict "remain[s] on the docket and judgment can be entered if the conviction [for the aiding-and-abetting count] is later reversed on appeal[.]" *Pakulski*, 439-40, 390 S.E.2d at 132; *see also Reeves*, 218 N.C. App. at 576, 721 S.E.2d at 322. Because the arrest of judgment on Count II was entered to avoid double jeopardy concerns and thus did not vacate the underlying verdict, Defendant's appeal is from a final judgment and is properly before this Court.

Defendant argues the trial court erred in denying his motion to dismiss because "[t]he State failed to establish Mr. Bradsher personally committed or acted in concert to commit obtaining property by false pretenses[.]" In reviewing the denial

of a defendant's motion to dismiss for sufficiency of the evidence, "the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 549-50 (2018) (citations and internal quotation marks omitted). "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *Id.* at 492, 809 S.E.2d at 550 (citation omitted). We hold there was insufficient evidence to support a conviction for obtaining property by false pretenses based on theory of acting in concert. We vacate the conviction of obtaining property by false pretenses.

Our Supreme Court has defined the elements of the crime of obtaining property by false pretenses in N.C. Gen. Stat. § 14-100 as follows: "(1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another." *State v. Cronin*, 299 N.C. 229, 242, 262 S.E.2d 277, 286 (1980) (citation omitted). The State may establish a person is guilty of the crime either because he personally committed the offense or because he "acted in concert" to commit it. In the present case, the State did not argue Defendant

personally committed all the elements of the offense; therefore, the State was required to show Defendant "acted in concert."

Our Supreme Court has noted

> the principle of concerted action need not be overlaid with technicalities. It is based on the common meaning of the phrase "concerted action" or "acting in concert." To act in concert means to act together, in harmony or in conjunction one with another pursuant to a common plan or purpose. These terms mean the same in the law of crimes as they do in ordinary parlance.

*State v. Joyner*, 297 N.C. 349, 356, 255 S.E.2d 390, 395 (1979) (internal citation omitted). Thus,

> [i]t is not . . . necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principle *so long as he is present at the scene of the crime* and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.

*Id.* at 357, 255 S.E.2d at 395 (emphasis added). "A defendant's presence at the scene may be either actual or constructive. A person is constructively present during the commission of a crime if he is close enough to provide assistance if needed and to encourage the actual execution of the crime." *State v. Gaines*, 345 N.C. 647, 675-76, 483 S.E.2d 396, 413 (1997) (internal citations omitted).

In the present case, Defendant argues, relying on *Gaines*, *State v. Greenlee*, 227 N.C. App. 133, 741 S.E.2d 498 (2013) and *State v. Zamora-Ramos*, 109 N.C. App.

420, 660 S.E.2d 151 (2008) that the State did not show "Mr. Bradsher's actual or constructive presence when [Ms. Blitzer] entered fraudulent hours in BEACON[,]" because "[n]o evidence demonstrated Mr. Bradsher was with [Ms. Blitzer] or otherwise actually present when [Ms. Blitzer] submitted her fraudulent hours[, t]here was no evidence of Mr. Bradsher's constructive presence when [Ms.Blitzer] entered her hours in Rockingham County[,]" and "[n]othing suggested Mr. Bradsher was communicating with [Ms. Blitzer] by phone or email when [Ms. Blitzer] submitted the fraudulent hours."

The State, in turn, argues Mr. Bradsher was constructively present because he "was close enough to help Ms. Blitzer defraud the State" and "actually did help her . . . . by tricking his employee, Mr. Stultz, into logging into B[EACON] and approving her hours." Furthermore, the State argues Mr. Bradsher was "close enough to encourage Ms. Blitzer to defraud the State" and "actually did so" by 'telling Mr. Blitzer to have her 'concentrate on school.'" In response to Defendant's argument that Mr. Bradsher was not close enough to assist Ms. Blitzer, the State argues that "Mr. Bradsher's proximity to Ms. Blitzer is irrelevant[,]" because "[c]onstructive presence turns on whether Mr. Bradsher was operationally close enough to help her, not on his 'actual distance' from her." The State also argues it is "irrelevant that Mr. Bradsher might not have helped or encouraged Ms. Blitzer immediately before or

after she submitted her hours[,]" because the crime at issue was a "continuing act" that Mr. Bradsher "encouraged."

After reviewing the record and the caselaw cited in the briefs, we hold the State did not establish actual or constructive presence and, therefore, there is insufficient evidence to establish Defendant committed the crime of obtaining property by false pretenses based on the theory of acting in concert.

As an initial matter, the State did not argue at trial or on appeal that Mr. Bradsher was actually present when Ms. Blitzer logged false hours in BEACON. Therefore, the State must show constructive presence, which requires showing that Mr. Bradsher "[wa]s close enough to provide assistance if needed and to encourage the actual execution of the crime." *Gaines*, 345 N.C. at 675-76, 483 S.E.2d at 413 (citation omitted). The criminal conduct alleged is obtaining property by false pretenses—the false pretenses alleged in count II in the bill of indictment being the submission of "fraudulent entries of hours worked for [Ms.] Blitzer to the State of North Carolina, Administrative Office of the Courts in Wake County, North Carolina, indicating the fact that she was entitled to be compensated for hours that [Mr. Bradsher] and his co-conspirators knew [she] had not worked." The record shows Ms. Blitzer submitted the falsified hours through BEACON from her work location in an office of the 17A district attorney's office in Rockingham County. As Mr. Bradsher argues, he was not physically present or anywhere near this office when Ms. Blitzer

inputted her hours; rather, he was at his own office in District 9A. Moreover, there is no evidence in the record to suggest Mr. Bradsher was in contact by phone or email to lend help or encouragement to Ms. Blitzer when she submitted the hours.

The State argues Mr. Bradsher was "close enough to help" Ms. Blitzer and he "actually did help her . . . . by tricking his employee, Mr. Stultz, into logging into B[EACON] and approving her hours." Although the record does show Mr. Bradsher told Mr. Stultz to approve the hours, that alone does not satisfy the requirement for constructive presence. Mr. Stultz's approval of the hours came long after and far away from the "actual execution of the crime" alleged in the indictment— that is, Ms. Blitzer's submission of falsified hours at her computer in Rockingham County. Although Mr. Bradsher's conversation with Mr. Stultz may have helped cover up that crime, the actual series of acts at issue had already been completed elsewhere. Thus Mr. Bradsher's acts did not help Ms. Blitzer in the actual execution of the offense. Any help Mr. Bradsher provided after the fact by justifying her hours to Mr. Stultz was too remote in both time and distance to support Defendant Bradsher's constructive presence "to provide assistance if needed and to encourage the actual execution of the crime." *Gaines*, 345 N.C. at 675-76, 483 S.E.2d at 413.

The State concedes Mr. Bradsher was not "near her or in contact with her" when Ms. Blitzer entered the fraudulent hours. Nevertheless, the State argues in its brief that "Mr. Bradsher's proximity to Ms. Blitzer is irrelevant"—that "[c]onstructive

presence turns on whether Mr. Bradsher was operationally close enough to help her, not on his 'actual distance' from her." The State cites *State v. Barnes*, 91 N.C. App. 484, 487, 372 S.E.2d 352, 354 (1988), *aff'd as modified*, 324 N.C. 539, 380 S.E.2d 118 (1989) (per curiam), in support of its contention. The State's reliance on *Barnes* is misplaced.

In *Barnes*, the defendant and several others were paid by the defendant's uncle to go to the house of the uncle's former girlfriend and "rough her up" and to "rough up" her boyfriend if he "got in the way." *Id.* at 486, 372 S.E.2d at 353. Two of the men approached the house while the defendant and another man stayed back. The two men assaulted the girlfriend and her boyfriend, but the boyfriend escaped and was caught by the defendant, who fired a gun ordering the boyfriend to return to the house with him and the other man. The trial testimony indicated the defendant was waiting either "down the road" or "five or six yards" from the house. The defendant was convicted of burglary based on the theory of acting in concert.

On appeal, the defendant argued the trial court erred in not dismissing the charge because he was not "present" when the other two assailants broke into the house. This Court held the State satisfied the requirement of constructive presence, noting that whether the defendant was five or six yards away or down the road, he was close enough to provide assistance by firing a gun to halt the fleeing victim. *Id.* at 487-88, 372 S.E.2d at 354. In so holding, the *Barnes* Court said "this Court has

held that actual distance is not determinative, but that 'the accused must be near enough to render assistance if need be and to encourage the actual perpetration of the crime.'" *Id.* at 487, 372 S.E.2d at 354 (citation omitted).

The State turns the rule stated in *Barnes* on its head by arguing that physical proximity is "irrelevant" to the question of constructive presence. *Barnes* makes clear that, while actual distance is not always "determinative" as to whether a defendant is present, such that a defendant some physical distance away can still be constructively present, actual distance remains highly relevant. There, this Court expressly noted the defendant was either five or six yards away or, at most, down the road, and the testimony at trial demonstrated he was physically close enough to render assistance, because he did so at the time of the actual perpetration of the crime, just after the house was broken into and as the assault on the occupants was occurring. In contrast, in the present case, Defendant Bradsher was not even in the same county when Ms. Blitzer recorded her false hours. Holding Defendant was near enough to give assistance and encouragement to Ms. Blitzer at that time, as the State requests in arguing "proximity is irrelevant to the question of constructive presence," would sever the "presence" requirement from the theory of acting in concert.

The circumstances in the case before this Court are analogous to *State v. Greenlee*, 227 N.C. App. 133, 741 S.E.2d 498 (2013), where this Court held a motion to dismiss a charge for acting in concert to obtain property by false pretenses was

improperly denied where there was no evidence the "defendant was present, nearby, *or even in the same county*." 227 N.C. App. 133, 138, 741 S.E.2d 498, 502 (2013) (emphasis added). In that case, the false pretense and the criminal act at issue involved the sale of stolen goods at pawn shops. *Id.* The State attempts to distinguish *Greenlee* by arguing that, here, "when Mr. Bradsher assisted Ms. Blitzer's crime, he was actually closer to the scene of the crime in Wake County, where the fraud culminated, than Ms. Blitzer was herself." As we have previously discussed, Mr. Bradsher's instructions to Mr. Stultz were too remote in distance and time to satisfy the requirement of constructive presence. Even so, the relevant "scene of the crime" for purposes of the presence requirement is not where the "fraud culminated" but where the "actual execution of the crime" occurred—the scene where the criminal acts at issue were perpetrated.[1] In this case, that is Rockingham County, where Ms. Blitzer submitted the fraudulent work hours.

The State also attempts to distinguish *Greenlee* by arguing that "unlike here, there was no suggestion that the defendant could have assisted remotely in the crimes at issue." Presumably, the "remote assistance" to which the State refers is

---

[1] *State v. Louchheim*, 296 N.C. 314, 250 S.E.2d 630 (1979), on which the State relies, established only that Wake County is a permissible venue for prosecution of obtaining property by false pretenses where some overt acts in furtherance of a conspiracy to defraud a state agency occurred there—not that it is the *only* permissible venue in such a case, nor that such location would even qualify as a "scene of the crime" for purposes of the theory of acting in concert, as distinguished from conspiracy.

Mr. Bradsher's ability to call, text, or email Ms. Blitzer if there was a problem in submitting hours.[2] But our courts have not held the actor's mere ability to contact or be contacted by another for assistance while the act was being committed was sufficient to show the other's constructive presence at the scene when the crime was actually committed. Indeed, in *State v. Zamora-Ramos*, this Court held there was insufficient evidence to support a conviction for trafficking in cocaine by transportation based on the theory of acting in concert even where the defendant "maintained telephone conduct with [the actor] during the commission of the crime," because "[t]he State did not produce any evidence that defendant was close enough during the commission of the crime to provide assistance to [the actor] if needed or to encourage the actual execution of the crime." *State v. Zamora-Ramos*, 190 N.C. App. 420, 425-26, 660 S.E.2d 151, 155 (2008). In the present case, there is no evidence that Mr. Bradsher engaged in contact of any kind with Ms. Blitzer when she was actually executing the crime. To hold the theory of acting in concert would be satisfied merely where "remote assistance" is possible would broadly expand the universe of criminal conduct under this theory.

Finally, the State argues Ms. Blitzer engaged in "successive acts of misrepresentation [that] were in essence a continuing act" and, therefore, it is

---

[2] To the extent those acts were assistance, they were, as discussed above, too remote in both distance and time from the act to satisfy the requirement that the defendant be "close enough to provide assistance if needed and to encourage the actual execution of the crime." *Gaines*, 345 N.C. at 675-76, 483 S.E.2d at 413.

irrelevant that Mr. Bradsher might not have helped or encouraged Ms. Blitzer when she submitted the hours. In support of this contention, the State cites *State v. Williams*, in which this Court held a continuous pattern of food stamp fraud could be considered a "continuous act" and thus reach the monetary threshold for a felony. 101 N.C. App. 412,415, 399 S.E.2d 348, 350 (1991). *Williams* is inapposite, however, because it interprets N.C. Gen. Stat. § 108A-53, the statute criminalizing food stamp fraud and, specifically, at which level the conduct covered can be treated as a felony. Although food stamp fraud involves a kind of false representation, it is a distinct offense from obtaining property by false pretenses. More fundamentally, it is not relevant to what constitutes the "execution of the crime" for purposes of the theory of acting in concert. Holding that acts committed anytime in the time period between discrete acts over many days would satisfy the requirement for constructive presence renders the presence requirement meaningless, particularly when combined with the State's argument regarding physical distance.

Because there is insufficient evidence to show Defendant Bradsher was constructively present when Ms. Blitzer inputted the fraudulent hours, we hold the trial court erred in denying Defendant's motion to dismiss the charge of obtaining property by false pretenses based on the theory of acting in concert.

## III. Conclusion

We hold the trial court erred in denying Defendant's motion to dismiss for insufficient evidence as to the charge of felony obstruction of justice based on allegations of false statements made to Agent Whitley because the State did not provide substantial evidence of obstruction to support the conviction. Next, we hold Defendant did not preserve his argument that Ms. Peed's testimony was not hearsay because it was a command. We further hold the trial court did not err in its jury instructions. Finally, we hold the trial court erred in denying Defendant's motion to dismiss the charge of obtaining property by false pretenses based on the theory of acting in concert because there is insufficient evidence that Defendant was constructively present when Ms. Blitzer inputted the fraudulent hours. Therefore, we vacate the trial court's judgment as to the offense of felony obstruction of justice. We also vacate the judgment of obtaining property by false pretenses based on a theory of acting in concert, which the trial court had arrested. We remand this case to the trial court to resentence Defendant based on the charges of misdemeanor obstruction of justice and failure to discharge duties that it had consolidated with the felony obstruction of justice charge which we have vacated.

NO ERROR IN PART, VACATED IN PART AND REMANDED.

Judges DIETZ and YOUNG concur.